BUTCHER *v* TOWNSHIP OF GROSSE ILE

OPINION OF THE COURT

1. TAXATION—PROPERTY TAXES—LIMITATION—CONSTITUTIONAL LAW.
   Property taxpayers do not have, under the Constitution of 1963, elective control over the fact, extent, or amount of monetary obligations that local public officers may incur on the strength of property taxes to be collected; all such taxes may constitutionally be imposed without limitation as to rate or amount and the only restraint on them is that which the legislature may choose to impose upon local public debts (Const 1963, art 9, § 6).

2. TAXATION—CONSTITUTIONAL LAW—LOCAL GOVERNMENT UNITS—BORROWING—BONDS—ASSESSMENTS—CONTRACT OBLIGATIONS.
   There now is no constitutional bar against borrowing by local units on the strength of taxes to be collected, whether that is done (a) by the issuance and sale of bonds, or (b) by the negotiation of other evidences of indebtedness, or (c) for the payment of assessments or contract obligations; whether the money borrowed is or is not to be used for operating expenses, taxes imposed to retire all such borrowing may be levied without limit as to rate or amount, subject only to legislative restriction, if any (Const 1963, art 9, § 6).

---

REFERENCES FOR POINTS IN HEADNOTES

[1] 52 Am Jur, Taxpayers' Actions § 12.
  56 Am Jur 2d, Municipal Corporations, Counties, and Other Political Subdivisions § 129.
[1–3, 7–10, 11–17, 19–21] 51 Am Jur, Taxation §§ 134, 138–141.
[2] 56 Am Jur 2d, Municipal Corporations, Counties, and Other Political Subdivisions § 628 *et seq.*
[4] (no reference)
[5] 50 Am Jur, Statutes § 159 *et seq.*
  56 Am Jur 2d, Municipal Corporations, Counties, and Other Political Subdivisions § 569 *et seq.*
[6] 56 Am Jur 2d, Municipal Corporations, Counties, and Other Political Subdivisions § 569 *et seq.*
[18] 51 Am Jur, Taxation § 64.

3. Taxation — Constitutional Law — 15-Mill Tax Limitation — Bonds.

The 15-mill tax limitation, under the present constitutional provision, does not apply to taxes levied to discharge bonded indebtedness (Const 1963, art 9, § 6).

4. Words and Phrases—Substance—Essence.

"Substance" means the same as "essence", that is to say, the most important element; the characteristic component or components; the main identifiable part of the subject in scrutiny.

5. Statutes—Scope of Title—Constitutional Law—Severability —Drains—Sanitary Sewage.

A section of a statute defining property from which sanitary sewage emanates, so as to include every parcel of land whereon is located a structure in which water is used or is available for use for household, commercial, industrial or other purposes is unconstitutional as the legislature undertook to enlarge the title of the statute beyond all constitutionally permitted doubt; though the unconstitutional section is severable by statute (Const 1963, art 4, § 24; MCLA 8.5, 123.191 [c]).

6. Health—Public Sanitary Sewer—Statutes.

Plaintiffs cannot under a statute be forced to connect to an available public sanitary sewer and pay, it not being claimed that sanitary sewage flows or emerges from plaintiffs' property contrary to any public or private interest (MCLA 123.191 *et seq.*).

Separate Opinion
Adams, J.

7. Taxation—Constitutional Law—Municipal Corporations— Villages—Counties—Townships—Charter Counties—Charter Townships—Charter Authorities—Governmental Units— Charters—Statutes.

*The only tax limitations upon cities, villages, charter counties, charter townships, charter authorities, or other authorities, because of the provision of the second clause of the second paragraph in a section of the state constitution regarding a 15-mill tax limitation on ad valorem taxes, are limitations contained in the charter of the governmental unit or in the general law of the State of Michigan enacted by the legislature; there is no constitutional limitation (Const 1963, art 9, § 6).*

8. Taxation—Constitutional Law—15-Mill Limitation—Ad Valorem Taxes—Bonds—Contract Obligations.

> The first clause of the second paragraph in a section of the state Constitution regarding 15-mill limitation on an ad valorem taxes applies across the board to all forms of governmental instrumentalities or units and as to any and all such units of government the limitations of the first paragraph of that section are not applicable as "to taxes imposed for the payment of principal and interest on bonds or other evidences of indebtedness or for the payment of assessments or contract obligations in anticipation of which bonds are issued" (Const 1963, art 9, § 6).

9. Taxation—Constitutional Law—15-Mill Limitation—Ad Valorem Taxes.

> What purports to be a 15-mill general ad valorem tax limitation upon real and tangible personal property in the first paragraph of a section of the Michigan Constitution is, if not illusory, certainly a much more miniscule limitation than was depicted in the Address to the People accompanying the proposed 1963 Constitution (Const 1963, art 9, § 6).

10. Taxation—Constitutional Law—15-Mill Limitation—Counties—Townships—Schools and School Districts—Bonds—Contract Obligations.

> The limitations of the first paragrah in the state Constitution regarding a 15-mill limitation on ad valorem taxes apply to counties, townships, and school districts, and all of the operations of such governmental units except for authorized operations of such units involving bonds or other evidences of indebtedness or other obligations in anticipation of which bonds were issued (Const 1963, art 9, § 6).

See Headnotes 5 and 6.

Separate Opinion

Williams, J.

See Headnote 10.

Separate Opinion

T. M. Kavanagh, C. J.

11. Taxation—Constitutional Law—15-Mill Tax Limitation—Governmental Units—Municipal Corporations—Villages—Townships—Bonds—Unchartered Township—Unchartered County—Ad Valorem Taxes—Voters' Approval.

> The 15-mill limitation in the state Constitution as applied to

*governmental units not coming under the designation of "city, village, charter county, charter township, charter authority or other authority" is a valid and binding constitutional limitation and the "nonapplication" clause constitutes no exception to this constitutional limitation; an unchartered township and county cannot tax or levy ad valorem property tax in excess of 15 mills without affirmative vote of qualified electors where the general obligation bonds and/or debt service rests directly or indirectly upon ad valorem taxation (Const 1963, art 9, § 6).*

12. CONSTITUTIONAL LAW—CONSTRUCTION—15-MILL TAX LIMITATION.

*The Constitutional Convention, faced with the alternatives of outright abolition of the 15-mill provision or adopting a "frozen" millage scheme to increase allowable millage and to abolish millage allocation boards, or to retain the 15-mill limitation as provided in the 1908 Constitution, rejected the first alternative and reached a compromise on the combination of the latter two alternatives.*

13. TAXATION—BONDS—LOCAL GOVERNMENT BONDS—CONSTITUTIONAL LAW.

*The statement in the Address to the People that "All bond issues of local units of government will have unlimited tax support" should not be misconstrued as a grant of power to tax; if it had been intended as such, it was well within the ability and experience of the drafters of the Michigan Constitution to so provide and, instead the prefatory remark in that Address must be recognized that "local government bonds will have unlimited tax support, thus permitting lower cost borrowing".*

14. TAXATION—CONSTITUTIONAL LAW—MUNICIPAL CORPORATIONS— VILLAGES—COUNTIES—TOWNSHIPS—CHARTER COUNTIES—CHARTER TOWNSHIPS—STATUTES.

*The only tax limitations in the second clause of the nonapplication paragraph in the state Constitution regarding a 15-mill limitation on ad valorem taxes "for any other purpose" upon cities, villages, charter counties, charter townships, charter authorities or other authorities are the limitations voted by the people which are incorporated in the charter of the governmental unit or those limitations enacted into law by the legislature; there is no constitutional limitation upon these governmental units to impose taxes "for any other purposes" (Const 1963, art 9, § 6).*

15. Taxation—Constitutional Law—15-Mill Limitation—Ad Valorem Taxes—Governmental Units.

> The first clause of the second pargraph in the state Constitution regarding a 15-mill limitation on ad valorem taxes applies across the board to all forms of governmental units (Const 1963, art 9, § 6).

16. Constitutional Law—Construction—Other Purposes—15-Mill Limitation—Ad Valorem Taxes—Bonds—Contractual Obligations.

> The term "other purposes" in the exclusionary provisions of the second clause of the second paragraph of the state Constitution regarding a 15-mill limitation on ad valorem taxes means operational costs covered by operational millage because, applying well-recognized canons of construction as well as the plain language of the provision, it is apparent that the purposes contemplated by the first clause of that paragraph are capital outlay or capital expenditures financed and debt serviced by bonds and contractual obligations of like nature (Const 1963, art 9, § 6).

17. Constitutional Law—Operational Costs—Counties—Townships—Schools and School Districts.

> The operational costs and expenditures of unchartered counties, unchartered townships and school districts, are by necessary implication, and in the absence of any negativing or "non-application" clause, subject to the limitations set out in the first paragraph of a section of the Michigan Constitution regarding a 15-mill limitation on ad valorem taxes (Const 1963, art 9, § 6).

18. Taxation—Inherent Power to Tax—Municipal Corporations —Constitutional Law—Legislature.

> Unlike the state, the municipality has absolutely no inherent power to tax and any power of taxation must be delegated to it, either by the constitution itself or by the legislature.

19. Taxation—Delegated Power to Tax—Constitutional Law— Construction—15-Mill Limitation—Ad Valorem Taxes.

> An enlargement of the delegated authority to tax cannot be inferred from the language of the first clause, second paragraph in the state Constitution regarding a 15-mill limitation on ad valorem taxes because constitutional provisions claimed to delegate the power to tax will be strictly construed in favor of the taxpayer, in determining whether any power

*to tax has been delegated and also, where it is conceded that some power to tax has been delegated, in determining the scope of the delegated power (Const 1963, art 9, § 6).*

20. CONSTITUTIONAL LAW—BONDS—VOTER RATIFICATION—AD VALOREM TAXES.

*It would render the clear language of the Constitution and the created categories of interested voters utterly meaningless to accept the argument that the taxpayers have no voice at the ballot box on bond issues, which may be both long and short term obligations, even though it increases the general ad valorem tax; the necessity of voter ratification is consonantly reflected in current controlling legislation.*

21. TAXATION—MILLAGE LIMITATION—AD VALOREM TAXES—CONSTITUTIONAL LAW—MUNICIPAL CORPORATIONS—VILLAGES—COUNTIES—CHARTER COUNTIES—TOWNSHIPS—CHARTER TOWNSHIPS—CHARTER AUTHORITIES—BONDS.

*All governmental units with power to tax, including those specified in paragraph 2, clause 2, viz., "city, village, charter county, charter township, charter authority or other authority," as well as unchartered units, are not limited, either as to rate or amount, as to tax imposed for capital outlay expenditures or bonded indebtedness, which is approved by the voters; as to operational expenditures, the maximum millage which may be levied is limited either by the charter provisions for those units subject to paragraph 2, clause 2 or by the 15–18–50 millage provision for those unchartered units and school districts subject to paragraph 1 of an article of the state Constitution dealing with a limitation on ad valorem taxes (Const 1963, art 9, § 6).*

See Headnotes 5 and 6.

Appeal from Court of Appeals, Division 1, Fitzgerald, P. J., and Levin and T. M. Burns, JJ., affirming Wayne, Joseph G. Rashid, J. Submitted June 24, 1971. Resubmitted September 14, 1971. (No. 33 June Term 1971, Docket No. 52,935.) Decided March 9, 1972. Rehearing denied May 9, 1972. Appeal dismissed by United States Supreme Court October 10, 1972.

24 Mich App 389 affirmed in part, reversed in part.

Complaint by Robert E. Butcher and Gladys K. Butcher, individually and on behalf of all taxpayers of the Township of Grosse Ile, against the Township of Grosse Ile, Wayne County Treasurer, Grosse Ile Sanitary Interceptor Drain & Treatment Plant Drainage District, and Wayne County for a declaratory judgment that certain township ordinances and a statute were unconstitutional and for an injunction prohibiting the township from collecting certain charges, from levying in excess of maximum allocated millage, requiring the discharge of certain liens, an accounting, and repayment of illegal charges. Summary judgment for defendants. Plaintiffs appealed to the Court of Appeals. Affirmed. Plaintiffs appeal. The Attorney General intervened. Affirmed in part, reversed in part, and remanded.

*Robert E. Butcher,* for plaintiffs.

*Moll, Desenberg, Purdy, Glover & Bayer,* for Township of Grosse Ile.

*Miller, Canfield, Paddock & Stone* (by *John H. Nunneley, Stratton S. Brown* and *Gilbert E. Gove*), for Grosse Ile Sanitary Interceptor Drain & Treatment Plant Drainage District.

*William L. Cahalan,* Prosecuting Attorney, and *Leo W. Cahalan, Aloysius J. Suchy* and *Lawrence O. Hinkle,* Assistant Prosecuting Attorneys, for Wayne County and Wayne County Treasurer.

*Frank J. Kelley,* Attorney General, *Robert A. Derengoski,* Solicitor General, and *Maxine Boord Virtue,* Assistant Attorney General, for the people.

*Amici Curiae:*

*Bauckham, Reed & Lang,* for Michigan Townships Association.

*Chester C. Pierce,* for State Association of County Drain Commissioners.

BLACK, J. *(for affirmance in part and reversal in part).* This appeal was argued first on June 24 last. The presentations that day apprised the Court fully that the main issue on review was of such statewide concern as to call for representation of the people by the Attorney General under MCLA 14.28 and 14.101; MSA 3.182 and 3.211. Accordingly, an order entered directing reargument of the appeal during the instant September session with request that the Attorney General brief the posed questions and participate in resubmission of the case. That has been done. The briefs and arguments of the plaintiffs, the defendants and those of the Attorney General, and the briefs of volunteering counsel *amicus,* have been most helpful in reaching one clear conclusion of uniform agreement. It is that an insidious "sleeper" has rested and now rests comfortably in the finance and taxation article of the Constitution of 1963. What if anything can be done about it is, of course, something else. That we perceive by conflicting quotations, *post,* of the respective briefs.

It is fair to say that one of the ten most notable opinions recorded in American jurisprudence was contributed by Mr. Justice Holmes, dissenting in *Northern Securities Co* v *United States,* 193 US 197, 400–411; 24 S Ct 436; 48 L Ed 679 (1904). With argument and reargument as noted, this appeal like *Northern Securities* has grown to the status of a

*great case* as well as a *hard case.* Hopefully, it will not make *bad law* on account of desperate or implausible effort to save that which, sadly, no longer is.[1]

Justice Holmes opened his review of *Northern Securities* with these oft quoted and ultimately prophetic words:

"Great cases like hard cases make bad law. For great cases are called great, not by reason of their real importance in shaping the law of the future, but because of some accident of immediate overwhelming interest which appeals to the feelings and distorts the judgment. These immediate interests exercise a kind of hydraulic pressure which makes what previously was clear seem doubtful, and before which even well settled principles of law will bend. What we have to do in this case is to find the meaning of some not very difficult words. We must try, I have tried, to do it with the same freedom of natural and spontaneous interpretation that one would be sure of if the same question arose upon an indictment for a similar act which excited no public attention, and was of importance only to a prisoner before the court."

The Court in *Northern Securities* was concerned with the interpretation and application of a congressional act; whereas our main question calls for the interpretation and application of a constitutional provision. The principle in today's instance is nonetheless the same. It consists of judicial duty "to read English intelligently" (Holmes, J. in *Northern Securities* at 401); English written with clever clarity into the *giving* first paragraph and the *taking* second paragraph of section 6 of the finance and taxation article (Const 1963, art 9).

---

[1] Division 1 said it all in one terse sentence (*Butcher* v *Grosse Ile Twp,* 24 Mich App 389, 396 [1970]):
"Thus, what was prohibited under the old constitution is clearly allowed under the new."

Section 6 in the constitution proper is headed
*"Limits on ad valorem taxes"*.  In Callaghan's Michigan Statutes Annotated and in West's Michigan
Compiled Laws Annotated the first paragraph of
the section is headed "15-mill limitation" and "15-
mill limitations" respectively, and the second pararaph (in both) is headed "Nonapplication of Limitation".  There is no such "Nonapplication" notice in
the constitution.  The two paragraphs, pertinent
here, read as follows:

"Except as otherwise provided in this constitution, the total amount of general ad valorem taxes
imposed upon real and tangible personal property
for all purposes in any one year shall not exceed 15
mills on each dollar of the assessed valuation of
property as finally equalized.  Under procedures
provided by law, which shall guarantee the right of
initiative, separate tax limitations for any county
and for the townships and for school districts therein, the aggregate of which shall not exceed 18 mills
on each dollar of such valuation, may be adopted and
thereafter altered by the vote of a majority of the
qualified electors of such county voting thereon, in
lieu of the limitation hereinbefore established.
These limitations may be increased to an aggregate
of not to exceed 50 mills on each dollar of valuation,
for a period of not to exceed 20 years at any one
time, if approved by a majority of the electors, qualified under Section 6 of Article II of this constitution,
voting on the question.

"The foregoing limitations shall not apply to taxes
imposed for the payment of principal and interest on
bonds or other evidences of indebtedness or for the
payment of assessments or contract obligations in
anticipation of which bonds are issued, which taxes
may be imposed without limitation as to rate or
amount; or to taxes imposed for any other purpose
by any city, village, charter county, charter town-

ship, charter authority or other authority, the tax limitations of which are provided by charter or by general law."

> *First:* Section 6 of article 9 considered, may the defendant township levy ad valorem taxes—without limit as to rate or amount—that are required to pay an assessment imposed upon the township by a drainage district board under chapter 20 of the drain code, *there being no approving vote of the electorate?*

This question with another to be considered was brought here for review of *Butcher* v *Grosse Ile Twp,* 24 Mich App 389 (1970). If upheld by the Court my reluctantly inevitable answer is bound to startle and then pain grievously thousands and thousands of property taxpayers of Michigan. It is that they no longer have any of that former 1933– 1963 elective control over the fact, extent, or amount of monetary obligations their local public officers may incur on strength of property taxes to be collected, and that all such "taxes may be imposed without limitation as to rate or amount". This is plain constitutional talk. The prodigal sky is now the *constitutional* limit and the only restraint left is that which the legislature may choose to impose upon local public debts—whether they are authenticated by bonds or by "other evidences of indebtedness"— when those debts are contractually made payable out of to-be-levied property taxation.

The exhaustive briefs submitted by plaintiffs' counsel and defendants' counsel, and those submitted by the Attorney General and counsel *amicus,* favor us with an abundance of necessarily complex reviews of statutes, decisions, official opinions, and interpretations of past and present statutory and constitutional provisions. All this however is mostly irrel-

evant.   We are exclusively and presently interested ⬅
in what the people chose to adopt when they voted
in April of 1963.   That brings us to the conflicting
interpretive positions counsel take when, in the dif-
ficult ultimate, each has faced the stark question
posed by our clerk's letter, this page (footnote).

Plaintiffs' counsel says:

*Plaintiffs' Contentions*

"It seems to Plaintiffs that the only thing that the
Constitutional Convention did and the only thing
that the Convention attempted to do in drafting the
nonapplication provisions of Section 6 of Article IX
relating to bonds, etc., was to provide that money
borrowed in anticipation of the collection of ad
valorem taxes on the strength of a vote of the quali-
fied electors could be certainly repaid regardless of
whether the proceeds from the specific millage au-
thorized by the electors for that purpose were suffi-
cient to retire the indebtedness."   (Brief filed March
4, 1971.)

The defendants join in telling us:

*Defendants' Contentions*

"The concise answer to this question[2] arrived at
by a consideration of the specific provisions of Sec-
tion 6 is that the taxes which remain subject to the
limitation are those which are not specifically ex-
cepted from such limitation by the provisions of the
second (or nonapplication) paragraph of said Sec-
tion 6.   As to any increases in the limitation to pro-
vide additional taxing power for purposes not spe-
cifically excluded by said second paragraph, such
increases remain in the direct control of the qualified
electorate.   For example, general purpose taxes
necessary for the operation of school districts, coun-
ties and unchartered townships, under existing law,
remain subject to the limitation and the allocation

---

[2] "What in your view will be left of section 6, within the *direct*
control of the qualified electorate, should the Court approve that
construction and application of section 6 for which the defendants
stand?"   (Question posed by clerk's letter to all counsel.)

of taxes thereunder, and any increase in said limitation for such purposes still remains in the direct control of the qualified electorate the same as it was under the provisions of the 1908 Constitution (Section 21, Article X).

"The changes made by the 1963 Constitution are two, as follows:

"A. All public corporations with taxing powers are now on the same basis as far as the levy of taxes to pay debt service on bonds or other evidences of indebtedness is concerned.

"B. The meaning of chartered 'municipal corporation' is specifically defined so as clearly to include charter townships, counties and authorities." (July 16 letter to clerk, responding to Court's inquiry of all counsel.)

"The lower courts have supported our contention that where bonds have been duly issued in anticipation of the payment of an at large assessment, the second, or 'non-application' provision of Article IX, Section 6 of the Michigan Constitution of 1963, is clearly applicable. It follows that the 15-mill limitation in the first paragraph of this constitutional provision does not apply; and that taxes to meet the assessment needed for payment of the bonds are fully authorized by the specific language of that second paragraph, and 'may be imposed without limitation as to rate or amount.' The lower courts have also sustained our contention that the proceedings taken are in complete and exact compliance with the Constitution of 1963 and the Drain Code. We expect to demonstrate in far less than 57 pages that these holdings are, indeed, fully in accord with both law and precedent." (Brief filed May 4, 1971.)

"In other words, since January 1, 1964, bonds issued by all public corporations or agencies in the state, pursuant to legislative authorization, which are basically secured by a pledge of ad valorem taxes, are now all on the same basis and not subject

*Defendants' Contentions —Cont'd*

to constitutional tax limitations as to rate or amount, the only tax limitation being the amount necessary to provide for payment of the principal and interest thereof as they become due." (Brief filed September 9, 1971.)

The Attorney General says:

*Attorney General's Contentions*

"What, then, is the meaning of the language of the second paragraph of Article IX, Section 6? The Attorney General submits that the answer is neither obscure nor cryptic but very clear indeed: The second paragraph of Article IX, Section 6 gives necessary recognition to the fact, thoroughly imbedded in municipal bond and constitutional law, that 'special fund' obligations are not to be affected by the 15-mill limitation, since they do not constitute general obligations of the bond issuing municipality, being financed otherwise than by general property taxes.
*   *   *

"Summarizing the position of the Attorney General:

"1. The 15-mill limitation established by Article IX, Section 6 of the Michigan Constitution of 1963 applies to all general obligation bonds supported by ad valorem property taxes unless an increase in the tax limitation has been voted by referendum, and except in a temporary emergency where necessary to honor the constitutional obligation of the contract with holders of outstanding bonds. The second paragraph of Article IX, Section 6 is a limitation, not a grant. It confers no authority to tax. Bond issuing municipalities may not plan in advance to burden their taxpayers by deliberately going into debt in order to create an obligation which will come within the exception to Article IX, Section 6, and then levying all or any portion of debt service over and above the 15-mill limitation. It is urgently in the public interest for this Court so to hold." (Brief filed September 8, 1971.)

*Attorney General's Contentions—Cont'd*

"It is the position of the Attorney General that in the absence of permission of the electorate the governing tax limitation may be exceeded only where the normal tax levying and collecting procedures fail to yield sufficient to meet debt service, and then only on a temporary advance basis.

"Otherwise, the tax limitation has ceased to exist." (Brief of Attorney General filed September 30, 1971.)

Amicus State Association of County Drain Commissioners insists:

*Contentions of Amicus SACDC*

"In apparent recognition of these problems, Article IX, Section 6, as finally adopted, unequivocally provides that taxes, levied for the purpose of paying principal and interest on bonds or to pay contract obligations or assessment in anticipation of which bonds are issued, are not subject to the 15-mill limitation. That portion of this section which permits taxation without limitation does not distinguish between cities, villages and school districts, on the one hand, and townships, counties and other public bodies, on the other hand, and on its face applies to all local taxing public bodies. It is, therefore, clear that all such taxing public bodies are authorized, by Section 6 of Article IX and obligated by the heretofore quoted sections of the Municipal Finance Act, Chapter 20, Act No. 185 and Act 342 or other similar acts, to levy a tax for these purposes, without limitation as to rate or amount, but in an amount not greater than the amount needed for these purposes. * * *

"It is respectfully submitted that, under the Michigan Constitution of 1963, and under the applicable statutes of the State of Michigan, taxes levied by a city, village, township, county or school district and any other public body having power to levy ad valorem taxes, for the purpose of paying principal and interest on bonds or of paying contract

obligations or assessments in anticipation of which bonds are issued, are to be levied, without limitation as to rate or amount, on all taxable property in the public body." (Brief filed August 27, 1971.)

"*Fourth,* the name of the game in reasonable public financing is unlimited tax support for public debt. *Tax support voted by electors, as an increase in millage, is not unlimited tax support.* Under the provisions of the Municipal Finance Act, the Legislature has authorized (in fact made mandatory) the levy of unlimited taxes to pay bonds issued by any public body with the power to tax. The same is provided in Chapter 20 with respect to taxes to pay at large drain assessments against any such public body." (Brief filed October 13, 1971.) (Emphasis by counsel.)

Amicus Michigan Townships Association insists:

"We believe that the language of the 1963 Constitution is clear and explicit: The tax rate limitations in the first paragraph of Article IX, Section 6, 'shall not apply to taxes imposed * * * for the payment of assessments or contract obligations in anticipation of which bonds are issued, which taxes may be imposed without limitation as to rate or amount * * * .' " (Brief filed June 9, 1971.)

The quoted respective contentions are of course those of able adversaries. No one agrees with another, save only that the defendant public units and officers, united with their companions *amicus,* find themselves uniformly in favor of unlimited property taxation, with all alleging frightening consequences should such without-a-vote-of-the-people taxation be restrained. Yet no counsel has been willing to come right out and say what the second paragraph of § 6 plainly manifests; that there now is no *constitutional* bar against borrowing by local units on strength of taxes to be collected, whether that is done (a) by the

issuance and sale of bonds, or (b) by the negotiation of "other evidences of indebtedness", or (c) for the "payment of assessments or contract obligations".

Whether the money borrowed is or is not to be used for operating expenses, "taxes imposed" to retire all such borrowing may be levied without limit as to rate or amount, subject only to legislative restriction, if any. I hold then, though loath, that Division 1 was right when it concluded (24 Mich App at 395, 396) :

"We find that although plaintiffs' contentions as regards the 15-mill tax limitation would be correct if we were still acting under Const 1908, art 10, § 21 (See *Township of Southfield* v *Drainage Board for Twelve Towns Relief Drains* [1959], 357 Mich 59), under the present constitutional provision, Const 1963, art 9, § 6, however, the limitation does not apply to taxes levied to discharge bonded indebtedness."

There is more that should be said.

If an actual or constructive fraud in the submission of a constitution or portion thereof could be made legally or equitably remedial, a meritorious case might—I say "might"—be made out of the affirmative repsesentations and the partially true representations that appear in that part of the "Preface" and the "Address to the People" which the constitutional convention appended with respect to § 6.

Hear first the "Preface to the Address to the People" Official Record, Constitutional Convention 1961, pp 3357, 3361:

*"Tax Limits, Exemptions*

"The 15-mill tax limit for property taxes is retained. However, local government bonds will have unlimited tax support, thus permitting lower cost borrowing. A county, its school districts and town-

ships may establish separate and fixed tax limita-
tions on a county-wide basis if the total does not
exceed 18 mills and the arrangement is approved by
a majority of the voters.  Exercise of this local op-
tion would eliminate the county tax allocation
board."

Then the "Address" starts out, pertinently:

"This is a revision of Sec. 21, Article X, of the
present constitution which continues in substance the
15-mill limit on property taxes."   (Same record, p
3399).

*Comment:* Does it so continue, "in substance" or
otherwise?   "Substance" to me means the same as
"essence", that is to say, the most important ele-
ment; the characteristic component or components;
the main identifiable part of the subject in scrutiny.
There is a visibly crafty conflict between the neatly
adroit precision of § 6 and this bland assurance of
continuity—"in substance".

The "Address" proceeds (same record, p 3399):

"The section continues present provisions which
permit the electors of any taxing district to vote ad-
ditional millage, subject to the present 20-year limit
and overall 50-mill limit."

*Comment:* Yes, it does purport to so continue, and
it does declare what always was for a separate con-
stitutional reason; that all bonds, *once they are val-
idly issued and sold,* shall have unlimited tax sup-
port.  But it does *not* say, anywhere, that limited or
unlimited borrowing by the issuance of bonds or
other evidence of indebtedness may be accomplished
without opportunity of the taxpayers to vote for or
against such borrowing, or for or against the in-
creased taxes that are required to retire such bor-
rowing.

The next to final paragraph of the pertinent part of the "Address" begins (same record, p 3399):

"All electors may vote on millage increases up to and including 5 years for general purposes, but only property owners and their spouses may vote on property tax increase proposals which extend for more than 5 years."

*Comment:* This must have led the about-to-vote elector to believe that new § 6 "continues in substance the 15-mill limit on property taxes" and also continues his right to "vote on millage increases up to and including 5 years for general purposes". But still there is no word in the "Address" about the *nonapplication,* effected by the second paragraph of § 6, of all of "The foregoing limitations" when borrowing is effected by action of the local board or commission upon assurance to the lender that the obligation or obligations will be retired via the levy of taxes "imposed without limitation as to rate or amount".

Bluntly stated truth in the "Address", exposing fairly the actual purpose of § 6, probably would have defeated the narrowly surviving Constitution of 1963. Yes, the property taxpayers of Michigan were yensed[3] in 1963, by § 6.

It is obiter of course to say that there may be a judicial remedy for this unfolded situation. The people doubtless are bound by the plainly written language of § 6, *for it was the constitution itself, distinguished from the subsequently prepared*[4] *"Address," which the people approved in 1963.* Behold

---

[3] An upper Peninsula colloquialism meaning deluded and duped, or conned and cozened, or beguiled and bilked; sometimes in a ribald or suggestive sense.

[4] 2 Official Record, Constitutional Convention 1961, p 3357 (footnote).

the dismal end of that great effort of a beset and embittered people who, in the property tax crisis of 1932, rose up and successfully initiated the since battered and now extinct § 21 of the tenth article of the former constitution. To one who lived through that crisis and the property tax moratorium effected by 1934 PA (Ex Sess) 11, and through the tragic sales of property which finally took place pursuant to the land board act of 1937 (No 155), it is not difficult to predict that, sooner doubtless than later, the people will have to repeat their initiatory action of 1932 lest they endure again what this Court—unaided at the time by legislation—had to stop on March 1, 1933, that is, the annual sale for unpaid taxes *of more than half the taxable property of Michigan.* See *Thompson* v *Auditor General,* 261 Mich 624 (1933), particularly the reporter's footnote at 628.

> *Second:* May the defendant township require that property be connected to an available public sanitary sewer, without a specific finding that an existing private sewage system is a health hazard?[5]

The parties plaintiff and defendant agree generally upon the question but not upon the answer. For an affirmative answer defendants rely upon 1961 PA 151, as amended by 1970 PA 191. They say:

"It is absolutely immaterial whether or not appellants' present private system is adequate. They must connect to the available sewer. This is compelled by health department regulation, by local ordinance and by the statute."

If the defendants are right, their answer must hinge upon valid applicability of the cited act of 1961, as amended.

---

[5] This is plaintiffs' Stated Question VIII, recast for nonargumentative brevity.

Excepting for presently impertinent deletion in 1970 of the restrictive phrase "containing more than 75,000 inhabitants", which phrase appeared after "counties" in the title of the act of 1961, the title of both enactments read as now does the 1970 amended title. The latter reads:

"An act to protect the health, safety and welfare of the people in counties by requiring properties from which sanitary sewage emanates to be connected to available public sanitary sewage collection facilities; to define properties affected by the act; to establish remedies and to fix penalties for the violation thereof."

The act of 1970 amends the title and sections 2 and 3 of the act of 1961. Section 1 of the act of 1961 remains intact. It says:

"Sec. 1. As used in this act:

\*   \*   \*

"(c) 'Property from which sanitary sewage emanates' means each parcel of land, as described in the last recorded deed of conveyance pertaining thereto, on which is located a structure or structures in which water is used or is available for use for household, commercial, industrial or other purposes. Industrial structures with a sanitary sewage disposal system approved by the state department of health shall be exempt from the provisions of this act."

When the instant case was originally submitted our decision of *Maki* v *East Tawas,* 385 Mich 151 (1971), affirming *Maki* v *East Tawas,* 18 Mich App 109 (1969), had not been decided. There we held unconstitutional a section of the involved statute (1964 PA 170; MCLA 691.1407; MSA 3.996[107]) which in its scope exceeded the permitted ambit of the title under which it appeared. I think the same conclu-

sion is due here, only more so, applying directly the reasoning of the same authorities as was supplied by Judge Danhof for Division 3 in *Maki* and by Justice T. G. Kavanagh upon affirmance of *Maki*.

By § 1.(c) the legislature undertook to enlarge beyond all constitutionally permitted doubt (Const 1963, art 4, § 24) the hedged-in margin of the quoted specific title, referring here to property "from which sanitary sewage emanates", so as to include *every* parcel of land whereon is located a structure "in which water is used or is available for use for household, commercial, industrial or other purposes"; the structure being within the 200-foot limit.    Section 1.(c) is, therefore, unconstitutional; severable though it is under MCLA 8.5; MSA 2.216.

The gratuitous assumption of the definition seems to be that wherever on a section 1(b) "particular property" water is used or is available for use, "sanitary sewage" is bound to "emanate" therefrom. "Emanate" as employed by Act 151 means "sanitary sewage" emerging or outflowing from property in such a way as to threaten the public health or create a nuisance, and there is no suggestion in the briefs or record that the property of plaintiffs Butcher "emanates" anything, much less "sanitary sewage".

Whether by the act of 1961 as it stood when this action was instituted in 1967, or by the act of 1961 as amended by the act of 1970, our response to the stated question must be the same.    It not being claimed that sanitary sewage flows or emerges from plaintiffs' property contrary to any public or private interest, plaintiffs cannot under the statute be forced to connect and pay.    *Maki* makes the constitutional principle plain for instant application.    I so hold.    This renders unnecessary consideration of the question of invidious discrimination, effected—if it

was—by the concluding sentence of quoted § 1(c). Too, it leaves for another case another obvious question; whether what may be a perfectly lawful and wholly inoffensive underground septic disposal system is a property right which may be condemned and destroyed without payment of just compensation.

I would vacate that part of the judgment below which determines affirmatively the second stated question (24 Mich App at 397–398), and order remand for further proceedings and entry of a judgment consistent with foregoing view of section 1(c). The remainder of the Court of Appeals' judgment I would affirm.

The nature of the case is such that no costs can be awarded. One can only extend to plaintiffs' counsel his respects for having unearthed and brought to this Court vital questions of public law which, long since, should have been exposed for knowledge if not betterment of the public weal. The protection of hitherto known property tax limitation, effected by constitutional provision, is no more.

T. E. BRENNAN, and T. G. KAVANAGH, and SWAINSON, JJ., concurred with BLACK, J.

ADAMS, J. Our task in this case is to construe the language of the Constitution of 1963, art 9, § 6. We must construe and reconcile insofar as possible all of the language of § 6. I agree with Justice BLACK that the language of the second paragraph of § 6 in large measure cuts away the limitations the first paragraph appears to create. The first paragraph sets forth various limitations—15 mills, 18 mills, 50 mills, and 20 years. Paragraph 2 opens with the broad language, "the foregoing limitations shall not apply",—and then, in separate clauses, two broad

categories or classifications are stated as to which the foregoing limitations do not apply. The first clause is the one that concerns us here.

Before turning to it, it may be helpful to examine the language of the second clause which is:

"The foregoing limitations shall not apply  *  *  * to taxes imposed for any other purpose by any city, village, charter county, charter township, charter authority or other authority, the tax limitations of which are provided by charter or by general law."

Because of this provision, the only tax limitations upon cities, villages, charter counties, charter townships, charter authorities, or other authorities, are limitations contained in the charter of the governmental unit or in the general law of the State of Michigan enacted by the legislature. There is no constitutional limitation.

Turning to the first clause of the second paragraph, it reads:

"The foregoing limitations shall not apply to taxes imposed for the payment of principal and interest on bonds or other evidences of indebtedness or for the payment of assessments or contract obligations in anticipation of which bonds are issued, which taxes may be imposed without limitation as to rate or amount  *  *  *  ."

The striking part of this language is that the opening portion of the clause states that the limitations foregoing do not apply and the closing words are a further reinforcement of this proposition—"taxes may be imposed without limitation as to rate or amount."

While the last clause of the second paragraph specifically lists certain units of government—cities,

villages, charter counties, charter townships, charter authorities or other authorities—and specifically omits from such listing counties, townships and school districts, there is no such enumeration of various forms of governmental units in the first clause. Consequently, it must be concluded that the first clause of the second paragraph applies across the board to all forms of governmental instrumentalities or units and that as to any and all such units of government the limitations of the first paragraph are not applicable as "to taxes imposed for the payment of principal and interest on bonds or other evidences of indebtedness or for the payment of assessments or contract obligations in anticipation of which bonds are issued".

I agree with Justice Black that what purports to be a 15-mill general ad valorem tax limitation upon real and tangible personal property in the first paragraph of § 6 is, if not illusory, certainly a much more miniscule limitation than was depicted to the people in the Address to the People accompanying the proposed 1963 Constitution. The limitations of the first paragraph do apply to counties, townships and school districts, and all of the operations of such governmental units, except for authorized operations of such units involving bonds or other evidences of indebtedness or assessments or contract obligations in anticipation of which bonds were issued.

I agree with Justice Black's holding as to the public sanitary sewer question and agree that, public questions being involved, no costs should be allowed.

Williams, J. (*separate opinion*). I concur with the results reached by my Brother Adams. Specifically I agree with his conclusion as to the impact of

the restrictions of the second paragraph of the first 15-mill limitation paragraph, namely:

"The limitations of the first paragraph do apply to counties, townships and school districts, and all of the operations of such governmental units, except for authorized operations of such units involving bonds or other evidences of indebtedness or assessments or contract obligations in anticipation of which bonds were issued."

T. M. KAVANAGH, C. J.  I concur in the result reached by Justice BLACK "in order for the court to be able at this time to agree on an opinion in this important case based on the prevailing constitutional doctrine," but without relinquishing our views hereafter expressed.  See *Time* v *Hill,* 385 US 374, 398; 87 S Ct 534; 17 L Ed 2d 456 (1967); and *Curtis Publishing Co* v *Butts,* 388 US 130, 170; 87 S Ct 1975; 18 L Ed 2d 1094 (1967); quoted with approval in *Wayne Circuit Judges* v *Wayne County,* 383 Mich 10, 38–39 (1969).

Upon review of the briefs and oral arguments of the parties, and particularly the debates of the Constitutional Convention, I am of the opinion that the 15-mill limitation as applied to governmental units not coming under the designation of "city, village, charter county, charter township, charter authority or other authority" is a valid and binding constitutional limitation and that the "nonapplication" clause constitutes no exception to this constitutional limitation.  In short, the unchartered defendants cannot tax or levy ad valorem property tax in excess of 15 mills without affirmative vote of qualified electors, where the general obligation bonds and/or debt service rests directly or indirectly upon ad valorem taxation.  The reasons supporting these conclusions are as follows.

Although one may certainly find supportive comments,[1] I cannot ascribe to the position of Justice Black that the drafters of our 1963 Const, art 9, § 6, "yensed" the property taxpayers of Michigan, either intentionally or inadvertently. A review of the Con Con debates discloses that the 3 alternatives presented to the Convention were: a) outright abolition of the 15-mill limitation under extant 1908 Const, art 10, § 21 (1 Official Record, Constitutional Convention 1961, pp 918, 921, 923. See also Citizen's Advisory Committee Report, Taxation and Finance at 10–11); b) modification of the 1908 constitutional provision so that the limitation on millage would be fixed or "frozen" at the highest millage rate exacted under a base period of 5 years and to effectually eliminate the tax allocation boards (see debate on Committee and substitute Proposal 56, 1 Official Record, Constitutional Convention 1961, pp 915–927); and c) retention of the 15-mill limitation provided in the 1908 Const (see debate on substitute Committee Proposal 56, 1 Official Record, Constitutional Convention 1961, pp 915–928). Expressly recognizing, to a man, the political infeasibility of the first alternative, *i.e.*, abolition, the drafters compromised on a "package" composed of the latter two alternatives.

The "Brake" substitute to CP 56, which was finally adopted by the convention by vote of 100 yeas to 30 nays, was explained by its proponent as follows:

---

[1] Some of our Con Con delegates, who are best left unnamed, intimated that political palatability played a role in *retaining* the 15-mill limitation as in the Const 1908, art 10, § 21 (see, *e.g.*, 1 Official Record, Constitutional Convention 1961, p 928).

Certainly, cogent arguments may be made against tax limitation itself. See Fundamentals of Municipal Bonds, p 107 (Investment Bankers Assn., 1959 ed). These arguments, however, are addressed to the people of our state. As to this policy decision, not a word in the debates suggests that the delegates, rather than accepting or rejecting the 15-mill limit, intended to resort to semantical subterfuge. See text, *infra*.

"In the first part of this, it provides for the 15 mill limitation as we have had it in the past. Unless the county takes other action, as I shall talk about in a minute, the 15 mill provision will prevail. The allocation board will be as it has been in the past. The schools, townships and counties will need to come before the allocation board each year and get the best share of the 15 mills that they can wrangle out of the allocation board. We tried when we were before you before to, we thought, improve this, but you didn't think so and rejected it.

"We now have this substitute and we think it's better, much better than what we had submitted to you before, and it is on a pure county option basis. We provide here that any county which, by the vote of the people, so desires may adopt a fixed division of millage; so much for the schools, so much for the townships, so much for the county, which shall stand without any action on the part of any allocation board until such time as the people themselves change it. It would not be necessary for any negotiations or any hearing every year. Until it proves that the people are dissatisfied with the division, that is it year after year. Now we were convinced that in order to get such a thing adopted by the people of any county you would have to have pretty generally the agreement of the schools, the counties, and the townships. We were convinced that you would not generally be able to get that agreement and still stay within the 15 mills; that there would have to be a little leeway in order to come to such an agreement. We have therefore suggested to you a maximum of 18 mills.

"Remember, this is only by vote of the people of the county. If the schools agree that they shall have 9 and the county that it shall have 6 and the townships, for instance, that they shall have 2, you would have a total of 17 mills. That proposition would be submitted to the people, and if they approved it that

would be the millage until there would be another vote of the people changing it.

"Now if they can agree on 15 mills as a maximum, they would be at liberty to do so; no compulsion at going above 15 mills, or even going to 15 mills. But we think we have got to allow a little margin there in order to make the thing work, and the margin we are suggesting is 18 mills. Now this would in no way, in no way, interfere with the right of the people to raise more millage than that by a vote, with only the limit of 50 mills as the total, the same as it has been in the past. So even if they use 18 mills in their permanent millage, they still could vote by school districts, by townships, by the counties, to have more millage than that, as long as they stay under the 50. Now this up to this 18 could not be done by a vote of the school district or a vote of the township or county on its own millage. That would have to be the combination, and it would be on a countywide basis." (2 Official Record, Constitutional Convention 1961, p 2628.)

For a thumbnail sketch of the major issues and decisions on this point, see also Sturm, Constitution Making in Michigan, 1961–1962 (University of Michigan Press, 1963), at 220–222.

The unassailably clear intent of the constitutional drafters was accurately and candidly presented in the Address to the People:

"This is a revision of Sec. 21, Article X, of the present constitution which continues in substance the 15-mill limit on property taxes. Statutory county tax allocation boards would be continued as the agencies charged with allocation of the 15 mills among the local units in the county. However, the section does permit the legislature to authorize initiative procedure within a county which would allow a majority of the qualified electors voting thereon to adopt a fixed division of millage among a county,

its townships and school districts, the total of which shall not exceed 18 mills. This fixed division and limit voted by the electors would stand until such time as they change it in another vote. This is simply a 'local option' provision which can never be effective without authorization of a majority of the electors in the county affected.

"The section continues present provisions which permit the electors of any taxing district to vote additional millage, subject to the present 20-year limit and over-all 50-mill limit. Cities and villages are expected, as at present, from the 15-mill limit. The exception is also extended to charter townships, and charter counties organized under the terms of this new document. Such units would be subject only to limitations established in their charters or by law." (2 Official Record, Constitutional Convention 1961, p 3399.)

In view of such unequivocal and unambiguous declarations, I must flatly reject the arguments made by counsel for defendants that the drafters intended to on the one hand provide, *pro forma,* a 15-mill limitation yet, on the other hand, by the nonapplication paragraph of art 9, § 6, to render it totally ineffectual in practice and not even subject to the governing vote of the affected taxpayers. Such argument not only violates fundamental canons of construction,[2] but finds no support in the debates. Certainly, such a constitutional "Trojan horse" was not within the contemplation or common understanding of the people of our state who adopted the 1963 Constitution. The intent of the people, in end analysis, controls and I will not suppose "that they have looked for any dark or abstruse meaning in the words employed, but rather that they have accepted them

[2] Cooley, Constitutional Limitations (7th ed), pp 91–94; 16 Am Jur 2d, Constitutional Law, §§ 58, 66–67.

in the sense most obvious to the common understanding, and ratified the instrument in the belief that that was the sense designed to be conveyed." Cooley, Constitutional Limitations, 81, quoted with approval in *Traverse City School District* v *Attorney General,* 384 Mich 390 (1971); *Carman* v *Secretary of State,* 384 Mich 443 (1971).

These fundamentals established, what then is the meaning and intent of the language in the "nonapplication" clause of art 9, § 6?

I must, of course, take at face value the statement addressed to the people that "All bond issues of local units of government will have unlimited tax support." (2 Official Record, Constitutional Convention 1961, p 3399.) This, however, should not be misconstrued as a grant of power to tax. *School District of City of Pontiac* v *City of Pontiac,* 262 Mich 338, 344 (1933). If it had been intended as such, it was well within the ability and experience of the drafters to so provide as they had in Const 1963, art 9, § 16.[3] I must, instead, recognize the prefatory remark in the Address that "local government bonds will have unlimited tax support, *thus permitting lower cost borrowing."* (Address to the People, 2 Official Record, Constitutional Convention 1961, p 3361.)

How was this objective to be accomplished and yet not give local governments unbridled taxing power? To aid in analysis of this question, it is helpful to quote and examine the second clause of the nonapplication paragraph.

---

[3] The pertinent constitutional provision reads:

"The power to tax for the payment of principal and interest on bonds hereafter issued which are the general obligations of any school district, including refunding bonds, and for repayment of any state loans made to school districts, shall be without limitation as to rate or amount."

See also, 1 Official Record, Constitutional Convention 1961, p 916.

" * * *  or to taxes imposed for any other purpose by any city, village, charter county, charter township, charter authority or other authority, the tax limitations of which are provided by charter or by general law."

The law is plain and uncontested that because of this provision the only tax limitations "for any other purpose" upon cities, villages, charter counties, charter townships, charter authorities or other authorities are the limitations voted by the people which are incorporated in the charter of the governmental unit or those limitations enacted into law by the legislature.[4] In short, there is no constitutional limitation upon these governmental units to impose taxes "for any other purposes." Three conclusions may and should be deduced from this initial construction of this second clause of this paragraph which, of necessity, affects and must be read in conjunction with the first clause of the nonapplication paragraph.

First, the specific enumeration of certain governmental units—cities, villages, charter counties, char-

---

[4] E.g., general village act, 1895 PA 3 (MCLA 69.1; MSA 5.1371). As to the nonapplicability of the limitations, the question and answer between Delegate Bradley and Chairman Brake is enlightening:

"MR. BRADLEY: Mr. President, I regret that I have to ask this kind of a question, but if I am in good conscience to understand what is going on, I must. Having come recently to the convention, I am not sure of the meaning of the committee proposal. The language provides for limits imposed by the local units of government themselves. Do I understand this to mean that a county, if it adopts a home rule charter, or if any of these charter townships or the cities and villages desire, under their own authority, to set a higher limit than that imposed by the legislature that this limit will prevail?

"PRESIDENT NISBET: Mr. Brake.

"MR. BRAKE: Any unit of government which is authorized by law to set a charter limit on its millage is not under this 15 mill provision. That would apply to your cities, of course, your villages, and if we adopt the home rule for counties and they adopt the charters, it would apply to them, and it would apply to a charter township. They fix their own millage limits." (2 Official Record, Constitutional Convention 1961, p 2629.)

ter townships, charter authorities or other authorities—specifically and intentionally[5] omits unchartered counties, unchartered townships and school districts. There is, of course, no such enumeration of the various governmental units in the first clause of the second paragraph. Consequently, it must be concluded that the first clause of the second paragraph applies across the board to all forms of governmental units.

Second, the exclusionary provision of the second clause of the second paragraph states that the limitation shall not apply to taxes imposed "for any other purpose" by the cities, villages, etc. What are these "other purposes"? I understand the term "other purposes" to mean operational costs covered by operational millage. The immediate antecedent of the second clause is, of course, the first clause which specifies one of the purposes for which taxes may be imposed, i.e., capital outlay expenditures or bonded indebtedness or, in the words of the Constitution, "taxes imposed for the payment of principal

---

[5] See 2 Official Record, Constitutional Convention 1961, p 3399. Address to the People quoted, supra, pp 70–71. We reject the suggestion that the addition of the phrase "or other authorities" encompasses any and all other governmental units not specifically enumerated by the preceding phrase. Such construction would not only grossly violate the canon of construction, "inclusio unis est exclusio alterius," but also ignore the manifest intent of the constitutional drafters to not foreclose increase of millage by metropolitan authorities, whether actually chartered or merely law authorities. As the proponent of the amendatory language, Delegate Hanna stated, 2 Official Record, Constitutional Convention 1961, p 3162:

"I think it was the intent of taxation and finance to exempt from the limitations these charter authorities, and I think when they used the term they were talking about all forms of metropolitan authorities, whether they were actually charter authorities or merely law authorities. And some of them are authorities that may be incorporated by joint action of legislative bodies and do not have a charter, as such, to be adopted. My amendment would simply insert that these authorities, whether charter or otherwise, would be exempt from the millage limitation and, thus, would make the 18 mill and the 15 mill limitation work for counties, townships and school districts." (Emphasis added.)

and interest on bonds or other evidences of indebt-
edness or for the payment of assessments or contract
obligations in anticipation of which bonds are is-
sued  *  *  *  ." Applying well-recognized canons
of construction[6] as well as the plain language of the
provision, it is apparent that the purposes contem-
plated by the first clause are capital outlay or capi-
tal expenditures which are to be financed and debt
serviced by bonds and contractual obligations of like
nature.[7] If the purposes specified in the first clause
are excluded, the only "other purposes" remaining
are those generally regarded as operational costs
financed by operating millage.[8]

This construction has two necessary results. The
only limitation upon the operational costs and, con-
versely, operational expenditures by cities, villages,
chartered counties, etc., is the limitation fixed by
vote of the people in the charter. The operational
costs and expenditures of the unmentioned govern-
mental units, viz., unchartered counties, unchartered

[6] The meaning of the words "other indebtedness" or "contract
obligations," etc., must be ascertained with reference to the context
and by considering what types of obligations are referred to by the
words with which they are associated. See *Wood* v *The Michigan
A L R Co*, 81 Mich 358 (1890); *Bennett* v *Carr*, 134 Mich 243
(1903). The maximum *noscitur a sociis* is applicable here and ex-
cludes the idea that the first clause refers to anything else other than
instruments usually considered to be in the nature of a bond.

[7] It is noted that the Citizens Research Council of Michigan, in
2 Comparative Analysis of the Michigan Constitution, focused upon
possible areas of revision and suggested to the delegates that if a
tax limitation is to be included in the 1963 Constitution, then the
delegates should consider, inter alia, the following questions:

"Should the limit cover all purposes for which property taxes
might be levied—special assessments, operating millage, debt service,
capital outlay millage, etc.? If not, which purposes should be
included and which excluded?" (X-27b.)

[8] See, *e.g.*, the analogy in the McCauley amendment which would
have left to the legislature the fixing of millage rates of townships,
counties and school districts to meet operating expenses "except
where such limits are provided by charter or other applicable home
rule provisions." (1 Official Record, Constitutional Convention 1961,
p 927.)

townships and school districts, are by necessary implication, and in the absence of any negativing or "nonapplication" clause, subject to the limitations set out in the first paragraph of art 9, § 6.

Finally and most crucially, nothing in either the second clause of the second paragraph or the first paragraph read in its entirety negates the idea that, as in the past, the municipal power to tax remains limited and, in most instances, subject to referendum.

Initially, it is observed that unlike the state, the municipality has absolutely no inherent power to tax and any power of taxation must be delegated to it, either by the constitution itself or by the legislature. 1 Cooley, Taxation, § 102 (4th ed). Our Court, cognizant of this fundamental principle, has of course held that the antecedent provision of the 1908 Const, art 10, § 21, is "not a grant of power, but instead a constitutional limitation upon the exercise of the general power of taxation." *School District of City of Pontiac v City of Pontiac, supra,* at 344. Neither can I infer an enlargement of the delegated authority to tax from the language of the first clause, second paragraph, for as stated by Mr. Justice COOLEY in his work on taxation, *supra,* at § 83:

"Constitutional provisions, or statute, claimed to delegate the power to tax will be strictly construed in favor of the taxpayer, in determining whether any power to tax has been delegated and also, where it is conceded that some power to tax has been delegated, in determining the scope of the delegated power."

Thus, the hotly disputed and controverted language[9]

---

[9] There would be much merit to the argument that the disputed language came about not so much by design, nefarious or otherwise, but rather by a metamorphosis brought on by style and drafting. Committee Proposal 56, when read to the Convention, provided as to the disputed language:

"This limitation shall not apply to taxes levied for the payment of interest and principal on obligations incurred prior to December 8, 1932, which sums shall be separately assessed in all cases. This limitation may be increased for not more than 20 years for taxes to be used for the payment of principal and interest on bonds or other evidences of indebtedness or for the purpose of capital outlay by a majority vote of the electors of the taxing district who are qualified to vote on the question of issuing bonds, voting thereon at any election. For any other purpose the limitation may be increased for not more than 20 years by a majority vote of the electors of the taxing district voting thereon at any election. This limitation may be increased when provided for by the charter of a municipal corporation." (1 Official Record, Constitutional Convention 1961, p 913.)

The first change in the disputed language occurred with the submission of a substitute for Committee Proposal 56 by Chairman Brake:

"Where this limitation applies it may be increased for not more than 20 years for taxes to be used for the payment of principal and interest on bonds or for the purpose of capital outlay by a majority vote of the electors of the taxing district who are qualified to vote on the question of issuing bonds, voting thereon at any election. For any other purpose the limitation, where it applies, may be increased for not more than 20 years by a majority vote of the electors of the taxing district voting thereon at any election. This limitation shall not apply to any city, village, charter township or other charter taxing authority to which a tax rate limitation applies pursuant to its charter." (1 Official Record, Constitutional Convention 1961, p 915.)

No amendments were at that time made to this paragraph. (1 Official Record, Constitutional Convention 1961, p 917.)

Then, Committee members Turner, *et al.*, who were apparently in the minority, offered the following amendment to the substitute Committee Proposal 56:

"The total amount of taxes assessed against property for all purposes in any one year shall not exceed 1–1/2 per cent of the assessed valuation of said property, except taxes levied for the payment of interest and principal on obligations heretofore incurred, which sums shall be separately assessed in all cases: Provided, That this limitation may be increased for a period of not to exceed 20 years at any one time, to not more than a total of 5 per cent of the assessed valuation, by a majority vote of the electors of any assessing district, or when provided for by the charter of a municipal corporation: Provided further, That this limitation shall not apply to taxes levied in the year 1932."

The policy issue, as well stated by Chairman Brake, was "whether or not we wish to continue with the 15 mill limitation as we have had it [Turner amendment], or whether we wish to try the new plan submitted by the majority of the committee [frozen millage]." (1 Official Record, Constitutional Convention 1961, p 921.) The Turner amendment prevailed. (1 Official Record, Constitutional Convention 1961, p 926.)

The next amendment came from Delegate McCauley, who proposed that the legislature be entrusted with setting the millage limitation:

must be construed in favor of the taxpayer in the sense that, although the power to tax has been delegated, it has not been delegated unconditionally or without limitation. To rule otherwise would violate every rule and canon pertaining to delegation of taxing authority. See Cooley, *supra,* §§ 80, 102, 119– 130a. As to any purported distinction between operational taxes being limited either by charter in the case of cities, etc., or by the 15-18-50-mill limitation in the instance of unchartered counties, etc., I would again refer to Cooley's discussion concerning taxation by counties, § 119 at 266:

"In determining the existence or extent of an alleged delegated power to tax, the statute must be strictly construed against the power to tax, and a delegation of power to tax for certain purposes will not be extended so as to authorize taxation for other purposes."

---

"The legislature shall by general law fix limits on the rates of ad valorem taxes which may be levied by counties, townships, school districts and other political subdivision * * * ." (1 Official Record, Constitutional Convention 1961, p 927.)

The amendment was initially adopted (1 Official Record, Constitutional Convention 1961, p 928), but in the end, Chairman Brake's substitute to the McCauley amendment was eventually adopted:

"The limitations established herein or by county vote may be increased to an aggregate of not to exceed 50 mills on each dollar of such valuation, except as otherwise provided by law, for a period of not to exceed 20 years at any one time, by the vote of a majority of the qualified electors, as defined in Article II hereof, of any such taxing authority voting thereon.

"The foregoing limitations shall not apply to (a) taxes levied for the payment of principal and interest on bonds or other evidences of indebtedness, or for the payment of assessments or contract obligations in anticipation of which bonds are issued, which taxes may be levied without limitation as to rate or amount, or (b) taxes levied for any other purposes by any city, village, charter county, charter township or other charter authority the tax limitations of which are provided by charter or by general law." (2 Official Record, Constitutional Convention 1961, p 2628.)

Nothing said or read in support of these amendments even hints, that the Con Con drafters intended to delegate to the municipalities *all* taxing power as to capital outlay expenditures or intended in any way to diminish the electoral check of referendum.

The application of such rule to the instant case avoids reading into our constitutional provision a patent absurdity; that the delegated power as to operational expenses would be limited and subject to vote of the people beyond those limits, and yet capital outlay expenditures would be unlimited and not subject to referendum. Any attempt to utilize such categories or devices by a municipality would be suspiciously viewed as an indirect evasion of tax limits. In short, "a limitation on a municipal levy for current expenses cannot be exceeded by using a different designation for such an expense." 1 Cooley, *supra,* §§ 169, 371.

A further consideration which addresses our attention is that in both clause two of the second paragraph and the entire first paragraph referendum is an integral element in increasing taxes within the limits established either by charter or fixed by the constitution. In fact, as relating to unchartered counties, etc., in the first paragraph it is notable that all of the alternatives proposed by the constitutional drafters—whether it be an increase in excess of the 15-mill limitation, in the form of the "frozen millage" proposal or the "county option" 18-mill proposal—provided for a vote of the involved taxpayers (1 and 2 Official Record, Constitutional Convention 1961, pp 913, 914, 917, 923, 924, 2628–2630). In fact, and consonant with the tenor of the debates, the present constitution specifies a distinction in eligibility:

"All electors may vote on millage increased up to and including 5 years for general purposes, but only property owners and their spouses may vote on property tax increase proposals which extend for more than 5 years." (2 Official Record, Constitutional Convention 1961, Address to the People, p 3399.)

To accept defendants' argument that the taxpayers have no voice at the ballot box on bond issues, which may be both long and short term obligations, even though it increases the general ad valorem tax, renders the clear language of the constitution and the created categories of interested voters utterly meaningless. Cities and chartered units are, of course, controlled by vote on the charter provisions.[10] The necessity of voter ratification is consonantly reflected in current, controlling legislation.[11]

---

[10] Delegate Brake, chairman of the committee on finance and taxation stated as to increases over the 15-mill limitation carried over from the 1908 Const, art 10, § 21, that:

"As at present, the voters of any taxing district can vote additional millage, subject to the present 20 year limit and the overall 50 mill limit. Cities and villages are excepted, as at present, from the 15 mill limit, and the only limitation to which they will be subject is that established by charter or by vote of the people.

"All electors may vote on millage increases for general purposes, but only property owners may vote on taxes to retire bond issues or for capital outlay." (1 Official Record, Constitutional Convention 1961, p 913.)

One of the critical factors which eventually produced the substitute Committee Proposal 56 is developed in the following colloquy on the convention floor:

"MR. KNIRK:  *  *  *  The majority report, Mr. Brake, absolutely gives the local units of government the power to increase our taxes automatically without our consent?

"CHAIRMAN BENTLEY: Mr. Brake.

"MR. BRAKE: In some places, it makes available the highest millage you have had in those years 1957 to 1961. Now, that may in your particular instance—and it may not in some other instance—permit an increase. That is not a compulsory increase. You don't have to go there if you don't wish.  *  *  *

"MR. KNIRK: We go in for the fight, and I mean it's been a real tough battle. I would rather see the 15 mill limitation be retained, and then we will present our budget to the people, because we haven't lost on a single millage increase in our community for quite a number of years, rather than having an increased tax in the county and the township, and then still have to go to the people to get our millage.

"That's what I feel is going to happen. Therefore I would certainly object to the majority report." (1 Official Record, Constitutional Convention 1961, p 924.)

In any event, and as finally adopted by the Convention, the voter participation and approval is an essential part of Const 1963, art 9, § 6 (see 2 Official Record, Constitutional Convention 1961, p 2628, *supra*, note 3).

[11] See re tax anticipation notes MCLA 134.2(b); MSA 5.3188(14); bonds MCLA 135.7(2); MSA 5.3188(27); floating indebtedness

What is the net effect of our construction of Const 1963, art 9, § 6, paragraph 2, clause 1? It means that *all* governmental units with power to tax, including those specified in paragraph 2, clause 2, *viz.*, "city, village, charter county, charter township, charter authority or other authority," as well as unchartered units, are not limited, either as to rate or amount, as to tax imposed for capital outlay expenditures or bonded indebtedness, which is approved by the voters. As to operational expenditures, the maximum millage which may be levied is limited either by the charter provisions for those units subject to paragraph 2, clause 2 or to those unchartered units and school districts subject to paragraph 1 of section 6, in 15–18–50 millage.

I concur fully in the reasoning and holding of Justice BLACK as to the second question, whether defendant township may require that property be connected to and available to a public sanitary sewer without a specific finding that an existing private sewer system is a health hazard.

Public questions being involved, no costs are allowed.

---

MCLA 141.2; MSA 5.382.    Compare with revenue bonds MCLA 141-.106; MSA 5.2736, but see referendum provision in MCLA 141.133; MSA 5.2763.