STATE OF MICHIGAN, the Administrator of the United States Environmental Protection Agency, Greenfield Construction Company, Inc.; Lanzo Construction Company, Inc., Giannetti Construction of Michigan, Inc. and Rocco Ferrera & Company, Inc., Plaintiffs,

v.

The CITY OF ALLEN PARK; the Le Blanc Tile Drainage District; the Drainage District for Ecorse Creek Pollution Abatement Drain No. 1; the County of Wayne; Charles N. Youngblood, the Wayne County Drain Commissioner; Defendants.

STATE OF MICHIGAN, Robert Lindisch and Phil Serpetti, Jr., Plaintiffs,

v.

The CITY OF ALLEN PARK, Michigan, a Michigan Municipal Corporation, Defendant.

Nos. 79–74681, 79–74682.

United States District Court, E. D. Michigan, S. D.

Nov. 6, 1980.

Karl Overman, Asst. U. S. Atty., Detroit, Mich., for plaintiff Administrator of United States Environmental Protection Agency.

Thomas Emery, Asst. Atty. Gen., Lansing, Mich., for plaintiff State of Michigan Department of Natural Resources.

Abba I. Friedman, Laurence A. Berg, Hyman, Gurwin, Nachman, Friedman & Winkelman, Southfield, Mich., for plaintiffs Greenfield Construction Company, Inc., Lanzo Construction Company, Inc., Giannetti Construction of Michigan, Inc., Rocco Ferrera & Company, Inc.

Timothy Downs, Craig, Farber & Downs, Detroit, Mich., for plaintiffs Lindisch and Serpetti.

Kenneth D. Kruse, Allen Park, Mich., and Michael H. Feiler, Farmington Hills, Mich., for defendant Allen Park.

Robert P. Tiplady, Plymouth, Mich., for defendants Le Blanc Tile Drainage District, Drainage District for Ecorse Creek Pollution Abatement Drain No. 1, Charles N. Youngblood, Wayne County Drain Commissioner.

Douglas B. Dimitry, Asst. Corp. Counsel, Detroit, Mich., for defendant County of Wayne.

Charles R. Moon, Dickinson, Wright, McKean, Cudlip & Moon, Detroit, Mich., for amicus curiae.

## OPINION

FEIKENS, Chief Judge.

*Background*

This case concerns the water quality of the North Branch of the Ecorse Creek, a creek which begins just north of Detroit Metropolitan Airport, thirteen miles from the mouth. It flows eastward through the communities of Dearborn Heights, Allen Park, Lincoln Park and Ecorse, and merges with the South Branch of Ecorse Creek three–fourths of a mile west of the Detroit River. The point where the Ecorse River empties into the Detroit River is located in Lincoln Park. (P.Ex. 5, 24). The North

Branch of the Ecorse Creek is part of "waters of the state", as defined by the legislature, M.C.L. § 323.11(b) (M.S.A. § 3.531(b)), and has been designated for partial body contact uses. (P.Ex. 2, p. 39).

In May, 1969 the Michigan Water Resources Commission ("WRC") initiated a survey of the Ecorse River in conjunction with a plan of implementation to correct existing water quality problems. During wet weather, when flows within the combined sewer system are high, untreated domestic sanitary sewage and stormwater runoff are discharged from nine outlets along the North Branch of the Ecorse Creek and two outlets along the South Branch. (P.Ex. 5, 24). The WRC study showed high total and fecal coliform counts[1] in Ecorse Creek, as well as large concentrations of materials with high biochemical oxygen demand ("BOD") causing an extremely low level of dissolved oxygen[2] in Ecorse Creek. Algal densities were excessive and the only bottom-dwelling organisms existing were pollution-tolerant sludge worms. (P.Ex. 24). That study confirmed that the discharge of combined sewer overflows into the river was the principal cause of its "severely degraded condition". (P.Ex. 24, p. 1).

In November of 1970 the Michigan Department of Natural Resources ("DNR") ordered the communities within the Ecorse Creek Basin to correct pollution emptying into Ecorse Creek and the Detroit River. The Wayne County Drain Commissioner, Charles Youngblood, consequently authorized a study of the sewer system to determine solutions for water quality problems of Ecorse Creek. The culmination of this study was the *Facility Planning Study: Pollution Abatement of Ecorse Creek, Element 2–Combined Sewer Areas, Final Plan* (Wayne County Drain Commissioner, Feb-

ruary 1977). (P.Ex. 2). Three alternatives were evaluated on the basis of monetary costs, contribution to water quality goals, public acceptability, environmental impact and implementation capability. (P.Ex. 2, p. 7).

Alternative 1 called for Allen Park, Lincoln Park and Taylor to construct a new system of sewers to separate domestic sanitary sewage from storm runoff. This program would provide for continuous treatment of domestic sanitary sewage at the Wayne County Wyandotte Wastewater Treatment Plant during all flow conditions and the release of only storm surface runoff to Ecorse Creek. (P.Ex. 2, 8, 9 and 25). The end result would be to correct eight of the nine combined sewage overflows into the North Branch of the Ecorse Creek, with the remaining location being corrected independently by the City of Ecorse. (Sprow and Trim testimony, P.Ex. 2, p. 15). Alternative 2 proposed separation of combined sewers in Taylor, diversion of storm runoff from the LeBlanc Drain at an upstream point, and storage and treatment of the remaining combined sewer overflows. Alternative 3 called for no major modification of the sewer system, but addressed the problem by intercepting, storing and treating all the combined sewer overflows. (Trim testimony, P.Ex. 2).

The study recommended selection of Alternative 1 as the most cost-effective plan. Alternative 1 was formally selected for implementation by the North Branch of Ecorse Creek Drain Improvement Board following evaluation of input at a public hearing on January 27, 1977. (P.Ex. 2, p. 79). Alternative 1 received wide public support from citizen groups and endorsement by government agencies, including Allen Park, based on the beneficial environmental

---

1. Fecal coliform counts are counts of organisms associated with the digestive tracts of warm-blooded animals including humans, and provide an indication of the potential presence of disease-causing enteric organisms in the water sampled. Such enteric organisms are associated with water-borne diseases such as hepatitis and typhoid. (Canale and Willson testimony).

2. Dissolved oxygen measurements in water samples are an indication of the amount of oxygen in water available for use by biological organisms such as fish life which need oxygen for respiration. (Sprow testimony).

effects of the project. These effects include reduced energy use and costs for operation and maintenance of the Wyandotte Treatment Plant, a reduction in local basement flooding as well as risks to public health and safety due to increased sewer system reliability, and improved water quality in the Ecorse Creek, the Detroit River and Lake Erie with the reduction in solids, BOD, and phosphorus loading. (Trim testimony, P.Ex. 2, p. 88). The DNR and the United States Environmental Protection Agency ("EPA") approved Alternative 1. (P.Ex. 1).

Outfall 001 is one of the locations where combined sewer overflows occur and it contributes significantly to the pollution of the North Branch of the Ecorse Creek. A major source of the combined sewer overflow at outfall 001 is the LeBlanc Drain, which serves the LeBlanc Tile Drainage District, comprised of portions of Allen Park, Lincoln Park and Taylor, excluding areas served by the Detroit Water and Sewerage Department in the northern and southern portions of Allen Park. (Sprow testimony, P.Ex. 5(b)). Raw sanitary sewage and stormwater in the LeBlanc Drain, including combined sewage from branch sewer lines (the Moore Arm and Horger Arm), are conveyed through the LeBlanc Drain eastward to the River Drive Interceptor. (P.Ex. 5(b)). Before reaching the interceptor, the LeBlanc Drain flows into a junction chamber near the intersection of Capitol Avenue and River Drive in the City of Lincoln Park. During periods of dry weather the combined sewage flows by gravity from the junction chamber into a regulator device from which it is conveyed to the Wayne County Wyandotte Treatment Plant via the River Drive Interceptor. However, the River Drive Interceptor has insufficient capacity to convey high wet weather flows from the Ecorse Creek drainage basin to the Wyandotte Treatment Plant. During wet weather, when the water level in the LeBlanc Drain exceeds the water level in the North Branch of the Ecorse Creek, two

flap gates in the junction chamber will open and allow flows from the LeBlanc Drain to enter two enclosed pipes which convey combined sewage into the North Branch of the Ecorse Creek from outfall 001. (Sprow and Trim testimony, P.Ex. 7).

On June 14, 1977 the City of Allen Park Council passed a resolution approving the financing of drain improvements and authorizing a petition to the Wayne County Drain Commissioner requesting drainage improvements pursuant to Chapter 20 of the Drain Code of 1956, as amended, M.C.L. § 280.461 *et seq.* (M.S.A. § 11.1461 *et seq.*). (D.Ex. 46). Upon evaluation of a petition submitted by the Cities of Allen Park, Dearborn Heights, Lincoln Park and Taylor, County of Wayne and State of Michigan, and following statutory notice and public hearing, M.C.L. § 280.467 (M.S.A. § 11.-1467), a Final Order of Determination was entered on October 19, 1977, determining that the petition for a drainage project (designated the Ecorse Creek Pollution Abatement Drain No. 1) was sufficient and that the project was necessary for the public health and should be constructed. (D.Ex. 45).

On January 20, 1978 the DNR Water Quality Division issued NPDES permit No. MI–0026204 to the LeBlanc Tile Drainage District (replacing a prior permit issued on November 29, 1974) setting forth conditions for discharge from the LeBlanc Drain. (Sprow and Zugger testimony, P.Ex. 1).[3] The permit authorizes discharge from LeBlanc Drain until March 31, 1982, provided that the combined sewer overflows will be controlled by that time and that the LeBlanc Tile Drainage District complete construction of the sewer separation plan called for in the Element 2, Final Plan. (P.Ex. 1). In the interim period, the Wayne County Drain Commissioner, acting for and on behalf of the LeBlanc Tile Drainage District, is required to utilize to the maximum extent the available receiving sewerage system transportation capabilities for

---

**3.** Discharges from outfall 001 are regulated under the National Pollutant Discharge Elimination System (NPDES), established by the 1972 amendments to the Federal Water Pollution Control Act. 33 U.S.C. § 1251, *et seq.* See page 12 *infra.*

the delivery of combined sewage to the River Drive Interceptor and the Wayne County Wyandotte Wastewater Treatment facilities. (P.Ex. 1).

The EPA and DNR tendered Step III grants for federal and state financial assistance to implement the necessary construction program. (Sprow and Trim testimony, P.Ex. 1). EPA was to provide seventy–five per cent of the funding of the grant eligible portions of the project and DNR was to provide five per cent of such funding. The remaining twenty per cent of the cost was to be allocated among the local units of government which had originally petitioned for the pollution abatement project–Allen Park, Lincoln Park, Taylor and Dearborn Heights. (P.Ex. 2, p. 50).

Early in 1978 the Drainage District Board for the Ecorse Creek Pollution Abatement Drain No. 1 proposed an apportionment of costs which was confirmed, following statutory notice and hearing, on April 26, 1978. (D.Ex. 44). An assessment roll was prepared which set Allen Park's apportioned cost at 52.9105% of the local share amount of $20,040,981.76 to be assessed to the cities, state and county. (D.Ex. 46(a)). The Drainage District Board divided the construction project into thirteen construction contracts for work in the four communities involved and advertised them for competitive bidding. Bids were received on all thirteen contracts and opened on June 27, 1978. (D.Ex. 43).

The bids for the project were higher than the Drainage Board had originally estimated. Consequently defendant Allen Park raised objections to various facets of the sewer separation project in July of 1978, and in August, 1978 filed suit against the Drainage District for the Ecorse Pollution Abatement Drain No. 1, the Drain Commissioner and Treasurer of Wayne County, and the County of Wayne in the Wayne County Circuit Court (No. 78–825–174–CZ), seeking an injunction against the project. (Ex. 2, Allen Park's Answer). That case settled when the parties, upon endorsement by the DNR and approval by the EPA, agreed to divide the project into two segments. (Attachment C, Lindisch and Serpetti complaint).

Segment I consists of Contracts 6, 7, 8, 9, 10, 11 and 12 and covers sewer separation and stormwater control in the cities of Taylor, Dearborn Heights and Lincoln Park. Segment II consists of Contracts 1, 2, 3, 4, 5 and 13 and covers sewer separation, sanitary retention facilities and pumping facilities for the City of Allen Park. Pursuant to the settlement agreement, Ecorse Creek Drainage District awarded only Contracts 6 through 11 and readvertised Contract 12. (D.Ex. 41). Federal and state grants were received for Segment I and the work on that segment is substantially completed. (Sprow and Trim testimony). Approval of the segmentation was conditioned upon the commitment of Charles Youngblood, Wayne County Drain Commissioner, and the LeBlanc Tile Drainage District to complete Segment II by March 31, 1982.

Contract specifications accompanying the bids for Segment II specify a needed construction time of 730 days (2 years). On December 14, 1978, EPA notified the Wayne County Drain Commissioner and City of Allen Park that, in accordance with the requirements of 40 C.F.R. § 35.930–4(b), the Drain Commissioner must commit to a schedule by which the various segments of the project would be accomplished. (Attachment C, Lindisch and Serpetti complaint). In response, the Wayne County Drain Commissioner, Charles Youngblood, in a letter dated January 31, 1979, committed the Drainage District to initiating construction of the Allen Park segment by March 1, 1980 and to completing construction of the project by March 31, 1982 as required by the NPDES permit. (Attachment D, Lindisch and Serpetti complaint).

On November 28, 1979, DNR issued notices of violation to the City of Allen Park and the LeBlanc Tile Drainage District. (P.Ex. 3, 4). The notices of violation were issued because under the DNR projected schedule for completion by March, 1982, bid advertisements for the Allen Park segment must have begun by October 30, 1979, and the City of Allen Park and the LeBlanc Tile

Drainage District had failed to initiate the process.

On December 12, 1979, two complaints were filed against Allen Park[4] for its failure to proceed with the Element 2 project, which were subsequently consolidated by an order dated February 21, 1980. The case assumed its present posture on April 15, 1980 when the DNR and EPA, originally named as defendants by the construction company plaintiffs, were realigned as plaintiffs by my order pursuant to Rule 21 of the Federal Rules of Civil Procedure.

*Jurisdiction*

Jurisdiction is vested in this court pursuant to Section 505 of the Federal Water Pollution Control Act Amendments of 1972, 33 U.S.C. § 1365(a) ("FWPCA"), and 28 U.S.C. § 1331, in that the amount in controversy exceeds the sum or value of $10,000 and arises under the Constitution, laws or treaties of the United States. Pendent jurisdiction exists for the state law claims and relief sought under the Water Resource Commission Act, M.C.L. § 323.7(1) (M.S.A. § 3.527(1)); the Drain Code, M.C.L. § 280.-461 *et seq.* (M.S.A. § 11.1461 *et seq.*); and the Court Order Bond Act, M.C.L. § 123.247 (M.S.A. § 5.2667). The plaintiffs seek a declaratory judgment under 28 U.S.C. § 2201 and injunctive relief under 28 U.S.C. § 2202.

**4.** *Lindisch and Serpetti v. The City of Allen Park*, No. 79–74682, and *Greenfield Construction Company. et al. v. The City of Allen Park., et al.*, No. 79–74681. The latter complaint also named the other defendants remaining in this suit, as well as EPA and DNR.

**5.** § 1365. Citizen suits

(a) Except as provided in subsection (b) of this section, any citizen may commence a civil action on his own behalf–

(1) against any person (including (i) the United States, and (ii) any other governmental instrumentality or agency to the extent permitted by the eleventh amendment to the Constitution) who is alleged to be in violation of (A) an effluent standard or limitation under this chapter or (B) an order issued by the Administrator or a State with respect to such a standard or limitation, or

(2) against the Administrator where there is alleged a failure of the Administrator to perform any act or duty under this chapter which is not discretionary with the Administrator.

*Standing*

There is no dispute that DNR has standing to bring an enforcement action against defendants in its realigned role as party plaintiff. FWPCA § 309, 33 U.S.C. § 1319; M.C.L. § 323.3 (M.S.A. § 3.523). However, the standing of the original plaintiffs in the suit, the Allen Park citizens and the group of construction companies, was challenged as not meeting the requirements of the citizen suit provision of FWPCA § 505, 33 U.S.C. § 1365[5]. That section authorizes a civil enforcement suit by any citizen after sixty days' notice against any person or governmental body in violation of an effluent standard or limitation or an order issued by the EPA or the State. "Citizen" for the purposes of this provision is defined to mean "a person or persons having an interest which is or may be adversely affected." FWPCA § 505(g), 33 U.S.C. § 1365(g). The term "person" under the Act includes a corporation. FWCPA § 502(5), 33 U.S.C. § 1362(5). An "effluent standard or limitation" includes "a permit or condition thereof issued under section 1342" of the Act. FWPCA § 505(f), 33 U.S.C. § 1365(f). Notice of intent to sue was given, as required by 33 U.S.C. § 1365(b). (Attachment A, Lindisch and Serpetti complaint).

\* \* \* \* \* \*

(b) No action may be commenced–

(1) Under subsection (a)(1) of this section–

(A) prior to sixty days after the plaintiff has given notice of the alleged violation (i) to the Administrator, (ii) to the State in which the alleged violation occurs, and (iii) to any alleged violator of the standard, limitation, or order, or

(B) if the Administrator or State has commenced and is diligently prosecuting a civil or criminal action in a court of the United States, or a State to require compliance with the standard, limitation, or order, but in any such action in a court of the United States any citizen may intervene as a matter of right.

(2) under subsection (a)(2) of this section prior to sixty days after the plaintiff has given notice of such action to the Administrator, . . .

\* \* \* \* \* \*

(g) For the purposes of this section the term "citizen" means a person or persons having an interest which is or may be adversely affected.

■ Defendant Allen Park contends that plaintiffs Lindisch and Serpetti are not persons "having an interest which is or may be adversely affected" because their sewers will not connect with the Element 2 project. The standing of the contractor plaintiffs, who do not allege residence in Allen Park or the Ecorse Creek vicinity, is challenged on the ground that the financial or generalized interest they seek to protect is not within the realm of interests protected by FWPCA. I disagree and find that both sets of plaintiffs are "persons having an interest which is or may be adversely affected" and therefore have standing under the citizen suit provision of FWPCA, 33 U.S.C. § 1365.

According to legislative history, the requirement that a person have "an interest which is or may be adversely affected" is to be interpreted in light of the Supreme Court's decision in *Sierra Club v. Morton*, 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1973). 1972 U.S.Code Cong. and Admin. News, pp. 3668, 3823. In that case, the Court denied standing under Section 10 of the Administrative Procedure Act, 5 U.S.C. § 702, to an environmental group which failed to allege specific harm to itself or its members.

Here, the Allen Park citizens, Lindisch and Serpetti, allege an interest sufficient to confer standing by claiming that they are residents and homeowners within the City of Allen Park whose properties and persons are adversely affected by the combined sewer system. Specific allegations of use of a resource are not necessary for plaintiffs living within the vicinity of the natural object they seek to protect, *See Montgomery Environmental Coalition v. Fri*, 366 F.Supp. 261, 264 (D.D.C.1973).

■ The contractor plaintiffs, who are the low bidders on Contracts 1 through 5 of the Allen Park segment of the Element 2 project, allege in their complaint that they all have incurred substantial expense in bidding the project and in committing millions of dollars of bonding capacity to it, and are therefore harmed by defendants' inaction.[6] The standing of the corporate contractors is challenged on the ground that their economic injury is not within the "zone of interests" to be protected by FWPCA, under the test for standing developed for suits under the Administrative Procedure Act ("APA") Section 10, 5 U.S.C. § 702.

The cases concerning "disappointed bidders" cited by Allen Park and EPA[7] are distinguishable from the present situation. Contrary to the typical "disappointed bidder" case, the contractors here are not suing EPA under the Administrative Procedure Act to protest rejection of their bids; rather, this suit is in the nature of an enforcement action against the defendants for their failure to take any action on the bids submitted or to commence construction, a violation of the terms of NPDES Permit No. MI–0026204. Contrary to the

---

6. Plaintiffs' counsel represents that the contractors agreed to hold their bids open at the stated prices for a reasonable time.

7. Courts have not been consistent in decisions on standing for disappointed bidders. Standing in suits challenging decisions by the EPA on bidding procedures is usually asserted under Section 10 of the Administrative Procedure Act ("APA"), 5 U.S.C. § 702, which provides "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." The Supreme Court has ruled that a person is "aggrieved" within the meaning of this provision if that person has suffered "injury in fact" and is "arguably within the zone of interests to be protected or regulated by the statute . . .". *Association of Data Processing Service Organizations, Inc. v. Camp*, 397 U.S. 150, 153, 90 S.Ct. 827, 829, 25 L.Ed.2d 184 (1970). At least two district courts have ruled that a bidder on a FWPCA contract is arguably within the zone of interests sought to be protected by FWPCA and therefore entitled to standing under APA § 10. *CCTW&M v. USEPA*, 452 F.Supp. 69, 75–76 (D.N.J.1978); *Union Carbide Corp. v. Train*, 73 F.R.D. 620, 622–24 (S.D.N.Y.1977). *But see Standard Engineers and Constructors Inc. v. USEPA*, 483 F.Supp. 1163 (D.Conn.1980) (Even though FWPCA and its regulations evidence an intent to protect "the integrity of the bidding process", contract bidders lack standing to sue on behalf of the public interest.); *Sovereign Construction Company, Ltd. v. City of Philadelphia*, 439 F.Supp. 692, 695–697 (E.D. Pa.1977); *aff'd. mem.*, 82 F.2d 1276 (3d Cir. 1978) (no standing under FWPCA, 33 U.S.C. § 1365).

usual situation in "disappointed bidder" cases, this suit will have the effect of spurring compliance with the NPDES permit, rather than hampering its implementation. Because the contractors do have an interest that is adversely affected by defendants' continued inaction, and because this is an enforcement action which will further the goals of FWPCA, I find that the contractor plaintiffs do have standing under the citizen suit provision of FWPCA § 505, 33 U.S.C. § 1365. *See State of Ohio ex rel. Brown v. Callaway*, 497 F.2d 1235, 1243 (6th Cir. 1974).

*NPDES Permit Violation*

The Federal Water Pollution Control Act Amendments of 1972 ("FWPCA"), 33 U.S.C. § 1251 *et seq.*, prohibit the discharge of any pollutant into waters of the United States except in compliance with a permit specifying conditions of discharge. FWPCA § 301, 33 U.S.C. § 1311. Authority to issue permits under the National Pollutant Discharge Elimination System ("NPDES") is vested in the Administrator of EPA, but that authority may be delegated to states upon application and approval by the EPA. FWPCA § 402(b), 33 U.S.C. § 1342(b). The State of Michigan has been granted authority to administer the NPDES permit program by EPA for sources discharging within the State. (Zugger testimony). Authority for issuing permits is founded on the State's Water Resources Commission Act, M.C.L. § 323.1 *et seq.* (M.S.A. § 3.521 *et seq.*), and procedures for issuance of NPDES permits have been established by the Michigan Water Resources Commission in Administrative Code 1954, AACS 77, R. 323.2101, *et seq.*

FWPCA authorizes imposition of "such conditions [on NPDES permits] as the Administrator determines are necessary to carry out the provisions of this chapter." FWPCA § 402(a)(1), 33 U.S.C. § 1342(a)(1). To establish a violation of 33 U.S.C. § 1311(a) or analogous state law,[8] plaintiffs must prove two elements: that defendants have discharged pollutants from a point source into navigable waters and that such discharge does not comply with a permit condition.

The plaintiffs produced studies of Ecorse Creek and the testimony of seven DNR employees and one independent expert witness to establish that defendants are discharging pollutants from outfall 001 in violation of the NPDES permit.

In 1970 the DNR conducted dye studies to ascertain whether sanitary sewage originating in Allen Park, as well as other communities, reached the North Branch of the Ecorse Creek via the LeBlanc Drain and concluded that it did. (Kilmer testimony, P.Ex. 29). Prior studies of the Ecorse Creek Basin indicate that on an average, .40 inches of rain in the basin is sufficient to raise the water level in the LeBlanc Drain enough to cause the flap gates to open and thus result in a discharge of combined sewage into the Ecorse Creek. (Sprow testimony, P.Ex. 9, pp. 7–55 to 7–67).

On two occasions since the filing of this suit, DNR personnel have conducted field investigations at outfall 001. On the first inspection during March 30–31, 1980, an overflow was observed from outfall 001 to the North Branch of Ecorse Creek, which continued for over three hours following approximately .54 inches of rain nearby. On the second investigation, April 3–4, 1980, an overflow from outfall 001 to the North Branch of Ecorse Creek was observed, following approximately .59 inches of rain nearby, which overflow continued for over seven hours. (Woods and Miller

---

**8.** State law similarly prohibits the discharge of wastes into waters of the state without a valid permit, and authorizes imposition of "such effluent requirements as the [Water Resources] Commission deems necessary to prevent unlawful pollution by such dates as the Commission deems to be reasonable and necessary and to assure compliance with applicable federal law and regulations." Water Resources Commission Act, M.C.L. § 323.7(1) (M.S.A. § 3.527(1)). Although plaintiffs also assert causes of action under the Michigan Environmental Protection Act of 1970, M.C.L. § 691.-1201 *et seq.* (M.S.A. § 14.528(201) *et seq.*), Article IV, Sections 51 and 52 of the Michigan Constitution, and under a common law nuisance theory, these claims are unnecessary to the resolution of this case.

testimony, P.Ex. 17, 20, 30). Under the conditions observed on April 4, 1980, the quantity of overflow from the LeBlanc Drain through outfall 001 amounted to approximately one–half the flow in the North Branch of Ecorse Creek upstream of outfall 001. (Miller testimony, P.Ex. 20).

Testing of samples of the overflow being discharged from the conduit showed that it contained excessive quantities of contaminants such as suspended solids, phosphorus [9], and fecal coliform, as well as excessively high biochemical oxygen demand ("BOD") (testimony of Willson, Woods and Canale, P.Ex. 17, Ex. 9, pp. 7–78 through 7–85, 7–87, 7–89, 7–90, 7–93, 7–94, 7–97).

The water quality standard with respect to fecal coliforms specifies that waters in the classification applicable to Ecorse Creek shall contain not more than 1000 fecal coliforms per 100 millimeters. (R. 323.1062(1), P.Ex. 2, p. 39, Ex. 22). Fecal coliform counts in the North Branch of the Ecorse Creek frequently exceed by many hundreds of times the maximum allowable fecal coliform level. (Woods, Willson, Kilmer and Canale testimony, P.Ex. 17, 24, 36, 37, 38).

Michigan Water Quality Standards limit BOD in waters of inland streams to an amount which will maintain a minimum of five milligrams per liter of dissolved oxygen (DO) daily average with no single measurement of DO less than four milligrams per liter. (AACS 1973, R. 323.1064, P.Ex. 22). Dissolved oxygen concentrations in the North Branch of the Ecorse Creek are frequently below the minimum specified in this water quality standard. (Woods and Canale testimony, P.Ex. 9, 19, 24, 36, 37, 38). The organic bottom sludges deposited from combined sewer overflows exert a substantial oxygen demand even at times when there is no combined sewer overflow actually occurring. (Canale testimony, P.Ex. 24, 36, 37, 38). The high density of blue–green algae also exerts a considerable oxygen demand at night when no photosynthetic activity is occurring. (Woods testimony, P.Ex. 24).

Recent sediment sampling in April, 1980 by the plaintiffs' witness, Dr. Raymond Canale, indicates that conditions of the stream continue to be as degraded as in the earlier DNR study conducted in 1969 (P.Ex. 24), and that sludge worms are still the only animals inhabiting the North Branch of the Ecorse Creek. (Canale testimony, P.Ex. 35, 36, 37, 38). The evidence establishes that pollutants contributed by the City of Allen Park are being discharged by defendants from outfall 001 into the North Branch of the Ecorse Creek.

The second factor, noncompliance with a permit condition, has also been clearly established by the evidence submitted by plaintiffs. NPDES Permit No. MI–0026204 requires the Wayne County Drain Commissioner to attain control of the combined sewer overflows at outfall 001 by March 31, 1982 and to complete construction of the Allen Park segment of the Element 2 plan. (P.Ex. 1). Contract specifications accompanying the bids for the Allen Park segment of Element 2 specify a needed construction time of two years, which was not rebutted by defendants. (Sprow and Trim testimony). EPA grant regulations require the grant agreement to contain a commitment to a schedule for construction of a project, 40 C.F.R. § 35.930 –4(b), and such a commitment was made an explicit condition of EPA's approval of segmenting the Element 2 project in 1978. (Attachment C, Lindisch and Serpetti complaint). Consequently, the Wayne County Drain Commissioner, Charles Youngblood, agreed to begin construction of the Allen Park segment of the project by March 1, 1980 in order to comply with the March, 1982 deadline in the NPDES permit. (Attachment D, Lindisch and Serpetti complaint). The March 1, 1980 deadline was not met and construction has not yet begun.

Although defendant Allen Park argued that there was no conclusive proof that Allen Park contributed to the discharges from outfall 001, I find that plaintiffs have established by clear and convincing evi-

---

**9.** The nutrient phosphorus in excessive quantities in water encourages increased biological activity, such as promoting high densities of blue–green algae. (Sprow testimony).

dence that defendants have discharged and are discharging pollutants into the North Branch of the Ecorse Creek through outfall 001 and, by failing to proceed with the funding and construction of Segment II of the Element 2 Final Plan, are in violation of NPDES Permit No. MI–0026204.

*Remedy*

■ Having found that defendants are in violation of NPDES Permit No. MI–0026204, the remaining issue to consider is the remedy to be imposed. Plaintiffs seek an order enforcing the terms of the NPDES permit, namely requiring defendants to proceed immediately with financing and constructing Alternative 1 of the Element 2 Final Plan. Defendant Allen Park raises three arguments challenging such a remedy. First, Allen Park alleges a procedural defect underlying EPA's grant approval and seeks an order requiring EPA to initiate preparation of a full Environmental Impact Statement, pursuant to the National Environmental Policy Act, 42 U.S.C. § 4321 *et seq.*, or alternatively to prepare a proper Environmental Impact Appraisal. Second, the City argues that the approval of Alternative 1 of the Element 2 Final Plan and granting of funds by EPA and DNR are arbitrary and capricious actions. Finally, Allen Park contends that it is precluded from financing its local share of the project because of the law and Constitution of the State of Michigan.

*NEPA Counterclaim*

In a counterclaim, Allen Park contends that EPA has failed to meet the requirements of the National Environmental Policy Act of 1969, 42 U.S.C. § 4321 *et seq.* ("NEPA") in its preparation of the Negative Declaration and Environmental Impact Appraisal ("EIA"), which preceded EPA's decision to award a Step II grant for the Element 2 Final Plan. (Ex. A, Allen Park's Cross–Claim).

NEPA was enacted to encourage federal agencies to preserve and enhance environmental quality by mandating new procedural steps in administrative decisionmaking. Environmental Impact Statements ("EIS") are required under NEPA for federal decisions which constitute "major Federal actions significantly affecting the quality of the human environment." NEPA § 102, 42 U.S.C. § 4332(C). Each federal agency is required to promulgate procedures for compliance with NEPA, NEPA § 103, 42 U.S.C. § 4333, and is responsible for determining whether an EIS is required for a particular action. EPA regulations contain general provisions regarding NEPA compliance, 40 C.F.R. § 6.100, *et seq.* (1976), as well as provisions specifically geared to NEPA compliance when EPA is considering proposed wastewater treatment works construction grants. 40 C.F.R. §§ 6.500–6.514. The regulations require the grant applicant to submit an environmental assessment as part of the Facilities Plan submitted to EPA. 40 C.F.R. § 6.512. EPA then reviews the assessment and other relevant information in deciding whether a full EIS or a Negative Declaration is required, applying the criteria in 40 C.F.R. § 6.200 and § 6.510.

In this situation, EPA determined that the project would not cause a significant environmental impact and issued a Negative Declaration and Environmental Impact Appraisal in accordance with 40 C.F.R. § 6.212. (Ex. A, Allen Park's Cross–Claim). These documents were made available to the public, including the City of Allen Park, on March 14, 1977, and the public was given fifteen days to file comments with the EPA on the Negative Declaration and EIA. 40 C.F.R. § 6.212(a). The City of Allen Park filed no objection to the Negative Declaration. Because the few comments submitted raised no significant objections, EPA approved the final Facilities Plan and awarded the Step II grant.

■ The equitable doctrine of laches is applicable to suits brought under NEPA. *Ecology Center of Louisiana, Inc. v. Coleman,* 515 F.2d 860, 867 (5th Cir. 1975); *Clarke v. Volpe,* 342 F.Supp. 1324 (E.D.La. 1972), *aff'd.,* 461 F.2d 1266 (5th Cir. 1972). Three criteria must be met before laches will be applied to bar a claim. The party invoking laches must show a delay by the

opposing party in asserting a right or claim, that the delay was not excusable, and that there was undue prejudice to the party against whom the claim is asserted or, in this case, to the public interest that Congress seeks to protect. *Ecology Center of Louisiana, Inc. v. Coleman, supra,* at 867.

I conclude that laches should be applied to Allen Park's counterclaim in this suit. Allen Park has not hitherto raised any objections to EPA's Negative Declaration and Environmental Impact Assessment, either during the administrative commenting period beginning March 14, 1977, or by invoking judicial review of the agency decision and documents. Allen Park, to the contrary, had endorsed the project[10] and petitioned the Wayne County Drain Commissioner to initiate construction of Alternative 1 in June of 1977.

The reason offered for the delay by Allen Park in raising objections to the plan is that city officials could not have known the "potential destructive effect" of the sewer separation plan until construction plans were finalized shortly before May of 1978, (Representation of counsel, ¶ 12, Allen Park's Proposed Findings and Conclusions), and that they filed suit expeditiously in state court after that. However, the suit against the Drainage District, the Wayne County Treasurer and Drain Commissioner, and Wayne County, filed in August of 1978, challenged the project on financial grounds and raised no environmental objections at that time.

To allow Allen Park to proceed with its NEPA claim now would be prejudicial in several respects. Testimony at trial, including that of Allen Park's witness Alfred Benker, indicated that failure to complete the Allen Park segment of the project would be detrimental to the other two communities involved, Lincoln Park and Taylor,

which had completed at least eighty per cent of their portions of the sewer separation project at the time of trial. The failure to complete the Allen Park segment of the sewer separation project would cause the stormwater system in Taylor to continue to contain sewage because of sewage flows from Allen Park along Pelham Road, and could result in odor problems from sewage sludge accumulating in the retention basin. In addition, continued conveyance of Allen Park's combined sewage to the Wyandotte Wastewater Treatment Plant will increase the load on that facility, which it may not be able to adequately treat, and will prevent Lincoln Park and Taylor from realizing their share of the reduction of about $200,000 in wastewater treatment costs that Segments I and II were planned to provide. (Trim testimony, P.Ex. 2, App. C). In addition to the other communities involved in the project, the federal and state governments have detrimentally relied on Allen Park's earlier endorsement of the project in expending eighty per cent of the costs of the Lincoln Park and Taylor portions of the sewer separation project and in committing grant money for the Allen Park segment, which is necessary for the success of the project.

The nature of the project for which Allen Park seeks procedural relief is an important factor in weighing the respective prejudice to the parties. Although entailing short-term disruption of neighborhoods and streets during construction of separate sewers, the long-term result of the Element 2 Final Plan will be improved water quality for the North Branch of the Ecorse Creek and other downstream bodies of water. Further delay will serve to prolong the degraded condition of the Creek. The procedural mandates of NEPA, though important, should not be used to obscure one of

---

10. In a letter of January 4, 1977 to the Executive Director of the Southeast Michigan Council of Governments, Mayor Frank Lada of Allen Park expressed a "very strong recommendation" for the proposed Alternative 1 of the Element 2 Final Plan. (P.Ex. 2, App. H). Similarly, the minutes of a public hearing of January 27, 1977 on the Final Facilities Plan state

that Mayor Frank Lada indicated that Alternative 1 was the "unanimous choice of himself and the Allen Park City Council." (P.Ex. 2, App. E, Summary of Hearing at 3). In fact, the Allen Park City Engineer was a participant in the preparation of the Facilities Plan. (Trim and Benker testimony).

1018

the congressional purposes in enacting NEPA–"to promote efforts which will prevent or eliminate damage to the environment . . .". NEPA § 2, 42 U.S.C. § 4321.

It is of some relevance to the balancing of interests that Allen Park's claims of environmental impact do not appear to be particularly substantial.[11] Allen Park does not suggest an alternative which will improve the water quality over that contemplated by the Element 2 plan. The only environmental impact Allen Park raises in its NEPA counterclaim is the short-term impact from construction, a concern which was addressed, albeit briefly, in EPA's Environmental Impact Appraisal. The City's concern about reconsidering different alternatives arises primarily from its desire to reduce the City's financial burden from this project. Although fiscal concerns are undoubtedly important to city decisionmakers, they do not warrant a remand of EPA's decision not to prepare a full EIS in this instance.

It is important that challenges to the administrative process under NEPA be raised in the formulative stages of a project so that subsequent steps are undertaken with a full appreciation of the risks. *Washington Utilities and Transportation Commission v. FCC*, 513 F.2d 1142, 1169 (9th Cir.), *cert. denied*, 423 U.S. 836, 96 S.Ct. 62, 46 L.Ed.2d 54 (1975). *See Vermont Yankee Nuclear Power Corp. v. NRDC*, 435 U.S. 519, 549–555, 98 S.Ct. 1197, 1214–1217, 55 L.Ed.2d 460 (1977). This is particularly so

when the objecting party has been involved, as Allen Park was, in the planning of the project from its inception. As the court pointed out in *Washington Utilities and Transportation Commission, supra*, at 1169, there is a potential for abuse if parties objecting to a project are allowed to reserve an issue that might delay a project if all other attempts to stop it fail.

Consequently I find that Allen Park's NEPA counterclaim is barred by laches or estoppel. The City's delay in asserting its NEPA claim was not excusable and will cause undue prejudice to the public interest as defined by Congress and to the other parties affected which have detrimentally relied on Allen Park's prior support of the project. Even if Allen Park's claim were not barred by laches or estoppel, I would conclude that EPA's decision not to prepare an EIS was neither arbitrary nor capricious,[12] and that its Negative Declaration and Environmental Impact Assessment are legally sufficient.

*Review of the Element 2 Final Plan*

Separate from the question whether EPA's decision not to prepare a full Environmental Impact Statement was arbitrary or capricious, which I did not need to decide, is the question of the extent to which I can review the merits of EPA's and DNR's decisions to approve Alternative 1 of the Element 2 Final Plan and grant funds for its construction. EPA argues that such a claim should be barred because of a failure to exhaust administrative remedies under

---

11. Allen Park contends the Environmental Impact Appraisal and Negative Declaration are deficient for reasons which I have paraphrased as follows: (1) that EPA failed to take an independent look at the impacts and unduly relied on the plan prepared by firms with a financial stake in the project; (2) that costs are underestimated in the appraisal, and cost–effectiveness not discussed; (3) that the appraisal does not adequately consider alternatives, including a failure to consider subsequent changes in national policies and the "best management practices" outlined in a United States General Accounting Office document dated December 28, 1979 (Ex. B, Allen Park's Brief in Support of Review of Exhibit 2 [Element 2, Final Plan]); (4) that it fails to discuss the Element 3 study of stormwater treatment or a pending study of the Wyandotte Wastewater Treatment Plant

and the possible impact that may have on the alternative of chemical treatment of combined discharge; (5) that the chosen alternative will not attain water quality standards; (6) that the impact from construction will be more severe than originally contemplated because of proximity to existing structures, and in some areas construction may be infeasible; and (7) that the specifications requiring contractors to obtain private construction easements will cause undue delays.

12. *See Mid–Shiawassee County Concerned Citizens v. Train*, 408 F.Supp. 650 (E.D.Mich. 1976), *aff'd mem.*, 559 F.2d 1220 (6th Cir. 1977); *Bosco v. Beck*, 475 F.Supp. 1029 (D.N.J. 1979).

the Administrative Procedure Act of 1946 ("APA"), 5 U.S.C. § 701 *et seq.* The DNR similarly points out Allen Park's failure to exhaust state remedies by its failure to request a DNR hearing on the proposed permit prior to its issuance, pursuant to M.C.L. § 323.8(a) (M.S.A. § 3.528(a)), or to seek judicial review of the DNR's issuance of the permit within the 60–day time limit of M.C.L. § 24.304 (M.S.A. § 3.560(204)). Allen Park argues that under the court's inherent powers to fashion equitable relief I should refrain from enforcing a remedy which is arbitrary and unreasonable, such as the plan which plaintiffs seek to have imposed.

■ Even assuming it is proper for me to review the decisions of DNR and EPA, it is not my function to review the alternatives *de novo.* Insofar as this enforcement proceeding concerns the violation of the terms of an NPDES permit, I am not free to ignore the permit conditions imposed by the DNR requiring construction of Alternative 1 of the Element 2 Final Plan and to substitute another plan. Rather, I am constrained to a more limited standard of review and can overturn the decisions of DNR and EPA in approving Alternative 1 only if those decisions are arbitrary, capricious or an abuse of discretion. I must consider whether the decisions were based on a consideration of relevant factors and whether there has been a clear error of judgment. *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971). I cannot substitute my judgment as to the desirability of the chosen alternative for that of the agencies involved. *See Kleppe v. Sierra Club,* 427 U.S. 390, 410 n.21, 96 S.Ct. 2718, 2730 n.21, 49 L.Ed.2d 576 (1976); *Bosco v. Beck,* 475 F.Supp. 1029 (D.N.J.1979); *Mid–Shiawassee County Concerned Citizens v. Train,* 408 F.Supp. 650 (E.D.Mich.1976), *aff'd. mem.,* 559 F.2d 1220 (6th Cir. 1976).

The plan finally proposed for implementation was the result of long and extensive study, which is evidenced by a series of reports prepared over a period of seven years. (P.Ex. 2, 6A, 6B, 9, 10, 11, 12, 13, 14 and 15). Public hearings were held on December 9, 10 and 11, 1974, on the initial Facilities Plan for the Ecorse Creek Basin concerning whether or not the North Branch of Ecorse Creek should be enclosed. A public hearing on the final Facilities Plan was held January 27, 1977, following notice by publication and mailing to interested parties. (P.Ex. 2, App. E, Summary of Hearing, p. 3).

Despite its earlier endorsement of Alternative 1, Allen Park now contends that the imposition of that plan upon defendants would be arbitrary and capricious in several respects.

Allen Park alleges that insufficient data was collected regarding its contribution of combined sewage to the North Branch of Ecorse Creek and whether it was exceeding its purchased capacity in the Wyandotte Wastewater Treatment Plant to justify the large expense Allen Park will incur under the Element 2 Final Plan. I do not doubt that more data could have been gathered in the course of these studies. However, I find that there is sufficient evidence that Allen Park contributes some amount of combined sewage to the North Branch of the Ecorse Creek and that it is not arbitrary for DNR and EPA to require defendants to remedy discharges of sewage by separating the stormwater and sanitary sewer systems.

Another of the factors Allen Park points to as evidence of arbitrariness is that implementation of the Element 2 Plan will not achieve the objective of partial body contact standards of water quality in the North Branch of the Ecorse Creek. The DNR and EPA cannot be required to remedy either all of a problem or none of it, and I do not find it arbitrary or capricious for those agencies to effect a partial improvement of the water quality of Ecorse Creek by means of this project.

Allen Park correctly indicates that Contracts 1 through 5 will be useless until the retention basin, the subject of Contract 13, is located and implemented. However, Allen Park did not persuade me that finding a location for such a retention basin was so unlikely and added such an element of un-

certainty to the plan as to render it arbitrary and capricious.

Allen Park's claim that the plan is arbitrary because of the fact that the bids received were twice the amount of the estimates was premature at the time of trial. The DNR and EPA had not yet reviewed the bids at that time and hence there was no final agency action finalizing the cost of the project for a court to review. Allen Park filed no further objections following the approval of the low bids on Contracts 1 through 5 by DNR and EPA subsequent to trial;[13] hence there is no support for Allen Park's claim that Element 2 is arbitrary based on underestimated costs or excessive bids.

Allen Park's allegations of severe disruption of neighborhoods and physical danger to the citizens from extensive construction did not impress me as indicia of arbitrary action. Counsel for Allen Park presented the testimony of an engineer, William Latsch, in an attempt to show the impossibility of construction in some of the narrow rights of way within the city. While pointing out some difficulties of sewer construction, given the site limitations, that witness did not contend that the construction of the project was physically impossible. (Latsch testimony, D.Ex. 47–52). The fact that

construction will be more extensive and result in greater inconvenience to citizens and potentially greater damage to structures than initially anticipated is an inadequate basis in this case for a claim that agency action is arbitrary.[14] Furthermore, Allen Park should be held to a greater knowledge than the average citizen of the extent of its combined sewer system, and its claim of being surprised by the extent of construction causes some skepticism.

Allen Park has failed to establish that the imposition of the Element 2 Final Plan is arbitrary or capricious.

*Financing the Local Share*

■ In its answer in this lawsuit, Allen Park raised as a defense its inability to finance its local share because of the law and Constitution of the State of Michigan, specifically the recently–ratified Headlee Amendment to Article IX of the Michigan Constitution, and legislation implementing the Headlee Amendment. However, Allen Park submitted no brief on the subject nor did it offer any testimony to rebut that presented by plaintiffs' witness, Charles Moon, a prominent bond attorney and amicus curiae in this suit. I am persuaded by his testimony that funding for this project is not precluded by the law and Constitution of the State of Michigan.

13. During the course of the trial, the LeBlanc Tile Drainage District forwarded to the DNR its recommendation to award Contracts 1 through 5 to the low bidders. (D.Ex. 39). Subsequent to the trial, DNR recommended awarding only Contract 5 and rebidding Contracts 1 through 4 because of its concern with the high amount of the bids and the low number of bids submitted. A compromise solution was proposed by the DNR Grants Administration Section Chief Richard Hinshon, which involved selecting a disinterested, out–of–state bidder to make bids on Contracts 1 through 4, to see if the amounts submitted by the low bidders were within reasonable range. If that were determined to be the case, the contracts would be awarded to the original low bidders. A meeting was set up to establish the procedures for conducting the bidding by an independent contractor and to select that contractor. Attorneys in the case were invited to participate and asked to submit written requests to the Drainage Board if they wanted to attend. Allen Park attorneys did not make any written response. The DNR proceeded to select Roger J. Au & Sons, Inc., from

Mansfield, Ohio, a contractor with no prior knowledge of the project or existing bids. Based on the figures submitted by this independent contractor, which exceeded the bids made by the low bidders on all contracts, the DNR recommended awarding Contracts 1 through 4 as originally bid, and the EPA endorsed that recommendation. See Tiplady testimony, June 20, 1980, transcript of meeting in chambers. Although Allen Park attorneys subsequently requested leave to file a motion to allow a discovery deposition of Mr. Au, the independent contractor, no such motion was ever submitted to the Court.

14. Similarly, Allen Park's claim of severe economic upheaval to the citizens of Allen Park, because of the extensive disruption due to construction, is unsubstantiated. Allen Park provided no evidence upon which I can base any finding of an arbitrary or unreasonable impact from the alleged burden of providing extra municipal services while neighborhoods are disrupted by construction.

Procedures for financing the Allen Park segment of the Element 2 project in existence at the time that the Headlee Amendment was ratified are set forth in Chapter 20 of the Drain Code, as amended, M.C.L. § 280.461 *et seq.* (M.S.A. § 11.1461 *et seq.*). The provisions governing levying of taxes to pay assessments of the Drainage District are found in Sections 474 and 475 of the Drain Code, M.C.L. §§ 280.474 and 280.475 (M.S.A. §§ 11.1474 and 11.1475), which provide:

Sec. 474. * * * * The county board of commissioners of a county which has advanced money for a public corporation and which has not been reimbursed therefor, may order the public corporation and its officers to levy upon its next tax roll an amount sufficient to make the reimbursement on or before the date when its taxes become delinquent; and the public corporation and its tax levying and collecting officials shall levy and collect those taxes and reimburse the county. The foregoing shall not prevent the county from obtaining reimbursement by any other legal method. Assessments against the state shall be certified to the state highway commission and paid from state highway funds. The tax levying officials of each of the other public corporations assessed shall levy sufficient taxes to pay assessment installments and interest as the same become due unless there has been set aside moneys sufficient therefor.

\* \* \* \* \* \*

Sec. 475. Taxes levied by a public corporation for the payment of assessments hereunder shall not be deemed to be within any statutory or charter tax limitation. A public corporation may impose taxes without limitation as to rate or amount for the payment of the assessments in anticipation of which bonds are issued, which taxes shall be in addition to any taxes that the public corporation may otherwise be authorized to levy but not more than the rate or amount sufficient therefor.

Alternatives to ad valorem taxes as a means of raising funds to pay the assessment installments are authorized in Section 490 of the Drain Code, M.C.L. § 280.490 (M.S.A. § 11.1490), as follows:

Sec. 490. If the legislative body of a public corporation, which shall have been assessed under this chapter, shall determine that a part of the lands therein will be especially benefited by the drain project to the extent of any portion of the amount so assessed, then it may cause such portion to be assessed, according to benefits, against the especially benefited lands, provided such special assessment method of financing is not inconsistent with local financing policy as to similar drains and sewers . . . In lieu of or in addition to levying special assessments, the public corporation under the same conditions and for the same purpose may exact connection, readiness to serve, availability or service charges to be paid by owners of land directly or indirectly connected with the drain project, or any combination thereof.

Another act existing prior to the Headlee Amendment is the Court Order Bond Act, M.C.L. § 123.247 (M.S.A. § 5.2667), which is also applicable to projects of this sort. It provides:

Sec. 7. (1) In accordance with and to the extent authorized by law, when the water resources commission, the department of natural resources or the department of public health has ordered, or *when the water resources commission has issued a permit, or when a court of competent jurisdiction in the state* has ordered the installation, construction, alteration, improvement or operation of a sewage system, solid waste facility, or waterworks system, in any of the governmental agencies or municipalities herein mentioned, *and the plans therefor have been prepared, and approved by the state* department or commission having the authority by law to grant the approval, *the legislative body* or the respective legislative bodies thereof *may issue and sell the necessary bonds for the construction,* installation, alteration, operation or improvement thereof, including the treat-

ment works, and such other facilities as may be so ordered or *set forth in the permit as being necessary* to provide for the effective operation of the system. This provision shall be construed to allow a governmental agency or municipality the option of selling bonds under a water resources commission order or permit, or a department order, or taking or permitting the matter to go into court and selling bonds under a court order. The bonds shall bear interest at not to exceed the maximum rate permitted by Act No. 202 of the Public Acts of 1943, as amended, being sections 131.1 to 138.2 of the Michigan Compiled Laws, and be payable in not to exceed 40 years from the date of issuance. The legislative body or the respective legislative bodies shall determine the denomination of the bonds and the date, time, and manner of payment. *The amount of the bonds either issued or* outstanding *shall not be included in the amount of bonds which the* governmental agencies or *municipalities may be authorized to issue* under any statutes of this state or charters. Governmental agencies or *municipalities issuing bonds hereunder may raise such a sum annually by taxation as the legislative body* or respective legislative bodies *may deem necessary to pay interest on the bonds, and to pay the principal thereof as it falls due. The annual amount may be in excess of the authorized annual tax rate fixed by the statutes or charters.*

(2) Except as otherwise provided in this act, all bonds issued hereunder shall be issued and sold in conformity to Act No. 202 of the Public Acts of 1943, as amended. *Court ordered bonds shall not require voted approval of the electors* and shall not be subject to section 5(g) of Act No. 279 of the Public Acts of 1909, as amended, being section 117.5 of the Michigan Compiled Laws, as to publication of notice, petition and referendum. Bonds other than court ordered bonds issued under this act shall require voted approv-

al of the electors only if an appropriate petition is filed in accordance with the law. [emphasis added].

Cases prior to the effective date of the Headlee Amendment establish that a general law of the state is part of the charter of a city or a village. *See City of Jackson v. Vedder*, 209 Mich. 291, 294, 176 N.W. 557 (1920); *Amberg v. Welsh*, 325 Mich. 285, 293, 38 N.W.2d 304 (1949); *City of Hazel Park v. Municipal Finance Commission*, 317 Mich. 582, 601, 27 N.W.2d 106 (1947). Under the 1963 Michigan Constitution prior to the Headlee Amendment, there had been no constitutional tax limitation upon charter authorities, such as Allen Park; the only limitations were those contained in the charters of the governmental unit or in the general law of the State of Michigan enacted by the legislature. *Butcher v. Township of Grosse Ile*, 387 Mich. 42, 194 N.W.2d 845 (1972). The Drain Code and Court Order Bond Act, as general laws of the state, were incorporated in the charters of governmental units, and authorized unlimited taxes for payment of debt incurred for reasons of public health.

To what extent, if any, was the state of the law altered by the Headlee Amendment, formally known as Proposal E? The Headlee Amendment, which was ratified at a general election in 1978, amends Article IX, Section 6, of the 1963 Constitution of the State of Michigan and adds new Sections 25 through 34 to Article IX of the Constitution (effective December 22, 1978).[15] Paragraph 1 of Article IX, Section 6, establishes a 15 mill limitation on general ad valorem taxes, except as otherwise provided in the Constitution. The second paragraph, amended by Proposal E, grants an exception to the 15 mill limitation as follows:

The foregoing limitations shall not apply to taxes imposed for the payment of principal and interest on bonds AP-PROVED BY THE ELECTORS or other evidences of indebtedness APPROVED

---

**15.** To implement the Headlee Amendment, the Michigan legislature subsequently enacted several amendments to the Municipal Finance Act,

M.C.L. § 131.1 *et seq.* (M.S.A. § 5.3188(1) *et seq.*). *See* M.C.L. §§ 131.2, 131.4, 137.1a (M.S.A. §§ 5.3188(2), 5.3188(2.2), 5.3188(45a)).

BY THE ELECTORS or for the payment of assessments or contract obligations in anticipation of which bonds are issued APPROVED BY THE ELECTORS, which taxes may be imposed without limitation as to rate or amount; OR, SUBJECT TO THE PROVISIONS OF SECTIONS 25 THROUGH 34 OF THIS ARTICLE, to taxes imposed for any other purpose by any city, village, charter county, charter township, charter authority or other authority, the tax limitations of which are provided by charter or by general law.

Upon referring to newly–added Sections 25 through 34 of Article IX, Section 31 is found to be the relevant section imposing a constitutional tax limitation on cities. It provides that

> *Units of Local Government are hereby prohibited from levying any tax not authorized by law or charter when this section is ratified or from increasing the rate of an existing tax above that rate authorized by law or charter when this section is ratified*, without the approval of a majority of the qualified electors of that unit of Local Government voting thereon
> . . .
>
> The limitations of this section shall not apply to taxes imposed for the payment of principal and interest on bonds or other evidence of indebtedness or for the payment of assessments on contract obligations in anticipation of which bonds are issued which were authorized prior to the effective date of this amendment. [emphasis added].[16]

Section 31, by its terms, does not apply to taxes already authorized by law or charter when the section is ratified. Chapter 20 of the Drain Code and the Court Order Bond Act were in existence when Section 31 was ratified and at that time authorized imposi-

tion of unlimited taxes for the payment of debt incurred for reasons of public health. The tax levy provisions of the Drain Code have not been amended by the legislature since the passage of the Headlee Amendment. Thus I conclude that Allen Park is not prevented by the law and Constitution of Michigan from financing its assessed portion of the project without public referendum. Allen Park will be required to provide funds to meet its assessed obligation for its share of the Element 2 project, which may include, but is not limited to, the levying of a tax without limitation as to rate or amount on all taxable property in its jurisdiction.

*Conclusion*

The evidence produced at trial by plaintiffs, all of whom have standing under FWPCA, establishes by clear and convincing evidence that Allen Park contributes to the combined sewer overflows being discharged into the North Branch of Ecorse Creek. The failure of the defendants, Wayne County Drain Commissioner Charles Youngblood, the LeBlanc Tile Drainage District, the Drainage District for Ecorse Creek Pollution Abatement Drain No. 1, and the City of Allen Park to undertake the necessary actions to comply with the construction schedule contained in NPDES Permit No. MI–0026204 constitutes a violation of FWPCA § 301(a), 33 U.S.C. § 1311(a), and the Michigan Water Resources Commission Act, M.C.L. § 323.7(1) (M.S.A. § 3.527(1)).

Allen Park's counterclaim against EPA alleging noncompliance with NEPA § 102(2)(C), 42 U.S.C. § 4332(2)(C), is dismissed because of laches or estoppel. The NPDES permit condition requiring construction of the Element 2 Final Plan, which plaintiffs seek to enforce, is not arbi-

---

**16.** The Allen Park segment of the Element 2 project is not one which can be considered pre–Headlee pursuant to the grandfather clause in the second paragraph of Section 31. Application was made to the Municipal Finance Commission for approval of bonds and permission to sell them following apportionment and adoption of an assessment roll on the project in the spring of 1978. However, as part of the settlement of the litigation brought by Allen Park in Wayne County Circuit Court in August, 1978, the application for issuance of drain bonds for the Allen Park segment was rescinded September 19, 1978. *See* M.C.L. § 131.4 (M.S.A. § 5.3188(2.2)), which defines what obligations are to be considered pre–Headlee under Paragraph 2 of Section 31, above.

trary or capricious, nor is Allen Park barred from financing its share of the project.

Because of Allen Park's refusal to proceed with financing its segment of the project, plaintiffs are entitled to injunctive relief compelling financing and construction of the Allen Park segment of the Element 2 Final Plan, a project determined necessary for the public health.

A final order to this effect has been entered.